Major D. CALLOWAY, et al., Plaintiffs,

and

Walter M. Culbreath, Sr., et al., Plaintiffs-Intervenors,

v.

WESTINGHOUSE ELECTRIC CORP., Defendant.

Civ. A. No. 77–34–ATH.

United States District Court, M.D. Georgia, Athens Division.

Aug. 4, 1986.

David R. Sweat, Joseph P. Nelson, III, Athens, Ga., for plaintiffs.

Edward Katze, Atlanta, Ga., for defendant.

OWENS, Chief Judge:

### I. History of the Case

On May 28, 1969, twenty black employees of the Westinghouse Electric Corporation's Athens, Georgia, plant signed a petition alleging that Westinghouse discriminated against them because of their race. Plaintiffs Major D. Calloway and James Moses were among those signing the petition. The petition was mailed to the Equal Employment Opportunity Commission (EEOC), which treated the petition as an EEOC charge. The claimants wrote that: "We have been denied the right to advance from our present positions to other higher ones for which we are well qualified for. We have been told that we are qualified, but due to discriminatory practices in this plant we are yet denied these advancements." Calloway and Moses also submitted individual charges to the EEOC.

On April 13, 1973, the EEOC issued a five-page determination letter finding that Westinghouse did in fact discriminate against blacks. On April 27, 1977—eight years after the charge was filed—the EEOC issued a notice of right to sue. The notice of right to sue stated that "[t]he Commission has found reasonable cause to believe your charge of employment discrimination is true but has not entered into a conciliation agreement to which you would have been a party because attempts to achieve such a voluntary settlement with the respondent(s) have been unsuccessful."

On July 6, 1977, Major D. Calloway and James Moses filed this lawsuit against Westinghouse and the International Brotherhood of Electrical Workers, Local 2109, alleging that the defendants discriminated against them because of their race. The court subsequently allowed the plaintiffs to add the International Brotherhood of Electrical Workers as a defendant. However, the plaintiffs withdrew all claims against the union prior to trial.

The two named plaintiffs have sought from the beginning to have the complaint certified as a class action. A hearing on class certification was held on June 9, 1978. At the hearing, Walter M. Culbreath, Sr., William Goss, Jimmy Byrd, and Robert Freeman filed a motion to intervene as plaintiffs. On October 11, 1978, the court granted the motion to intervene and preliminarily certified the case as a class action under Fed.R.Civ.P. 23(b)(2), whose class members are:

all black persons who have been employed by Westinghouse Electric Corp. at its Newton Bridge Road, Athens, Georgia facility since November 20, 1968; all black persons in the Athens metropolitan area or otherwise within the labor pool area from which the above named facility draws employment applications from prospective employees willing to commute who have unsuccessfully applied for employment with Westinghouse Electric Corp. since November 20, 1968; and all black persons who will apply for work or will be employed by Westinghouse Electric Corporations's Newton Bridge Road facility in the future.

However, as contemplated by the Federal Rules of Civil Procedure, the court agreed to reexamine the question and scope of class certification following the presentation of evidence at trial.

The nonjury trial on the issue of liability was held in Macon on February 5–8, 1985, during which both sides presented expert statistical testimony, testimony by employees and former employees of Westinghouse, and voluminous documents. The plaintiffs contend that the defendant engaged in the widespread practice of racial discrimination with regard to (1) initial job assignment, (2) upgrading and transferring within the hourly bargaining unit, (3) promotion to supervisor and other salaried positions, (4) acceptance into skilled trades apprentice programs, and (5) employee discipline. Plaintiffs' proposed findings of fact and conclusions of law at 2–3.

Each side has submitted proposed findings of fact and conclusions of law, which the court has considered along with the trial transcript and all other documents in the record.

## II. Statute of Limitations for § 1981 Claim [1]

Westinghouse contends that the plaintiffs' section 1981 claim is barred by the statute of limitations.[2] In Georgia, employment discrimination actions under section 1981 are governed by O.C.G.A. § 9–3–22. *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1532 (11th Cir.1984); *Stafford v. Muscogee County Board of Education,* 688 F.2d 1383, 1389 (11th Cir.1982). That code section provides:

> All actions for the enforcement of rights accruing to individuals under statutes or acts of incorporation or by operation of law shall be brought within 20 years after the right of action has accrued; provided, however, that all actions for the recovery of wages, overtime, or damages and penalties accruing under laws respecting the payment of wages and overtime shall be brought within two years after the right of action has accrued.

O.C.G.A. § 9–3–22 (1982). It contains two limitations periods: a two-year period for suits for the recovery of wages, overtime, or damages, and a twenty-year statute for suits seeking equitable relief. *Stafford,* 688 F.2d at 1389. The limitations periods are not tolled by the pendency of a Title VII charge. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 466, 95 S.Ct. 1716, 1723, 44 L.Ed.2d 295 (1975); *Jeffer-*

1. The plaintiffs brought this action under Title VII, 42 U.S.C. §§ 1981, 1983, 1985, and 1988, and the thirteenth and fourteenth amendments to the United States Constitution. On January 21, 1985, Westinghouse filed a motion for partial summary judgment as to all claims except those arising under Title VII. The court advised the parties by letter that the motion would be carried with the case and decided after the trial. The plaintiffs have since advised the court that they wish to proceed only under Title VII and 42 U.S.C. § 1981. Therefore, defendant's motion is moot except as to the section 1981 claim. Although the motion was filed as a motion for partial summary judgment, Fed.R.Civ.P. 56 does not apply because the case has been tried. Therefore, the court's ruling on the motion is a conclusion of law.

2. In the memorandum in support of its motion for partial summary judgment at page 6 and note 2, Westinghouse argues that Title VII's 180-day limitations period applies to section 1981 claims, but Westinghouse conceded that the general rule is that O.C.G.A. § 9–3–22 applies. However, in its proposed findings of fact and conclusions of law, Westinghouse argues on page 99 that the applicable statute of limitations is O.C.G.A. § 9–3–33.

*son v. H.K. Porter Co.*, 648 F.2d 337, 339 (5th Cir.1981) (Unit B).

Section 9-3-22 "must be applied in a bifurcated manner so that an action for equitable relief is barred only after 20 years, but an action for back pay is barred after only 2 years." *Howard,* 726 F.2d at 1532. In the present case, the plaintiffs seek both back pay and injunctive relief. The complaint was filed in this court on July 6, 1977. As to plaintiffs' claims for declaratory and injunctive relief, the complaint is not barred under the controlling twenty-year statute of limitations. However, as to the plaintiffs' claims for damages under 42 U.S.C. § 1981, the two-year statute of limitations bars all damage claims for discrimination that occurred prior to July 6, 1975.

### III. Dismissal of Discipline Claim and Constructive Discharge Claim

The rule in this circuit is that:

the allegations in a judicial complaint filed pursuant to Title VII "may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission." In other words, the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970) (citation omitted). Therefore, the starting point for determining the permissible scope of the complaint in this case is the EEOC charge and investigation. *Griffin v. Carlin,* 755 F.2d 1516, 1522 (11th Cir.1985); *Eastland v. Tennessee Valley Authority,* 714 F.2d 1066, 1067 (11th Cir.1983); *Evans v. U.S. Pipe and Foundry Co.,* 696 F.2d 925, 929 (11th Cir.1983).

The original EEOC charge was filed by named plaintiff Calloway in February, 1969. Plaintiffs' exhibit E. He stated in his charge that "I have been discriminated against by Westinghouse, because I have been denied promotion, on account of my race, while Caucasians with less seniority and qualifications have been promoted ahead of me." *Id.* (He also alleged discrimination by the union, but because the union has been dismissed as a defendant, all claims against it are no longer relevant.) He further contended in his supporting affidavit that, among other things, Westinghouse requires all blacks to take the job qualification test, but does not require all whites to do so; that most blacks are hired as sweepers and janitors and are very seldom promoted above labor grade six; that there are no blacks in the salaried unit and there are no black foremen; and that blacks are excluded from all training programs. An amended charge was filed in June, 1969, by Calloway and nineteen other Westinghouse employees (including named plaintiff Moses). The letter signed by all twenty employees stated that "[w]e have been denied the right to advance from our present positions to other higher ones for which we are well qualified for." Named plaintiff Moses filed an amended charge on October 7, 1969, which alleged the same discriminatory practices.

The resulting investigation by the EEOC led to the issuance of a determination that there was reasonable cause to believe the charge is true. In its five-page determination letter, the EEOC found that more blacks than whites were placed in labor grades five and below because of the use of an invalidated test; that only whites were employed in technical and clerical positions and salaried and supervisory positions; that there were no blacks in the apprenticeship programs; and that none of the skilled workers were black. Plaintiffs' exhibit E.

■ Plaintiffs' claims of racial discrimination in initial job assignment, upgrading within the hourly bargaining unit, promotions to supervisor and other salaried-unit positions, and acceptance in the skilled trades apprentice programs are "like or related to" the allegations in the EEOC charge and investigation. However, in this court's judgment, the claim of racial dis-

crimination in discipline and Calloway's and Moses' claims of constructive discharge are not "like or related" and are thus not properly before the court. Accordingly, plaintiffs' claim of discrimination in discipline and Moses' and Calloway's constructive discharge claims are hereby DISMISSED.[3]

### IV. Failure to Prosecute

Westinghouse asks the court to dismiss this action under Fed.R.Civ.P. 41(b) for failure to prosecute.

A district court is authorized, on defendant's motion, to dismiss an action for failure to prosecute or to obey a court order or federal rule. The court's power to dismiss is an inherent aspect of its authority to enforce its orders and insure prompt disposition of lawsuits. The legal standard to be applied under Rule 41(b) is whether there is a "clear record of delay or willful contempt and a finding that lesser sanctions would not suffice." Dismissal of a case with prejudice is considered a sanction of last resort, applicable only in extreme circumstances. *Goforth v. Owens,* 766 F.2d 1533, 1535 (11th Cir.1985) (citations omitted). "A finding of such extreme circumstances necessary to support the sanction of dismissal must, at a minimum, be based on evidence of willful delay; simple negligence does not warrant dismissal." *McKelvey v. AT & T Technologies, Inc.,* 789 F.2d 1518, 1520 (11th Cir.1986).

■ Westinghouse's motion is based in large part on the eight-year period during which the plaintiffs' charge of discrimination was investigated by the EEOC. Westinghouse contends that the plaintiffs should have requested a right-to-sue letter from the EEOC so that the judicial complaint could have been filed earlier. The Eleventh Circuit has squarely held otherwise. *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1533 (11th Cir.1984).

■ Westinghouse also bases its motion on two periods during which discovery was not ongoing. These delays were not willful and thus cannot cause dismissal. Accordingly, the court declines to dismiss the case under Rule 41(b).

### V. Class Action Certification

After holding an evidentiary hearing, the court preliminarily certified a class defined as:

> all black persons who have been employed by Westinghouse Electric Corp. at its Newton Bridge Road, Athens, Georgia facility since November 20, 1968; all black persons in the Athens metropolitan area or otherwise within the labor pool area from which the above named facility draws employment applications from prospective employees willing to commute who have unsuccessfully applied for employment with Westinghouse Electric Corp. since November 20, 1968; and all black persons who will apply for work or will be employed by Westinghouse Electric Corporation's Newton Bridge Road facility in the future, with the understanding of the parties that this determination may be altered in whole or in part at the conclusion of discovery.

The court agreed to reconsider the class certification issue after hearing the evidence at trial. *See* Fed.R.Civ.P. 23(c)(1); *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986); *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1147–48 (11th Cir.1983).

This court recently discussed class certification in Title VII lawsuits in *Washington v. Brown & Williamson Tobacco Corp.,* 106 F.R.D. 592, 593–94 (M.D.Ga. 1985) (Owens, J.):

> This court is mindful that in determining whether a class action may be maintained it has no "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may

---

**3.** Even if the constructive discharge claims were properly before the court, Moses and Calloway could not prevail because their working conditions were not "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Board of Palm Beach County, Florida,* 786 F.2d 1554, 1557 (11th Cir.1986).

be maintained as a class action." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 178, 94 S.Ct. at 2153 (quoting *Miller v. Mackey International, Inc.,* 452 F.2d 424, 427 (5th Cir.1971)). On the other hand, the Supreme Court has made it clear that before a suit can go forward as a class action under Rule 23, a plaintiff who wishes to represent the class must demonstrate that his claim has some connection with the claims of the would-be class members. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157–59, 102 S.Ct. 2364, 2370–71, 72 L.Ed.2d 740 (1982).

The plaintiff in the *Falcon* case alleged that he was denied a promotion because he is a Mexican-American. He sought to maintain a class action on behalf of Mexican-American applicants who were not hired by Falcon's employer. The issue before the Supreme Court was the propriety of the class action. Deciding that issue, the Court held:

> Without any specific presentation identifying the questions of law or fact that were common to the claims of respondent and of the members of the class he sought to represent, it was error for the District Court to presume that respondent's claim was typical of other claims against petitioner by Mexican-American employees and applicants. If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action. We find nothing in the statute to indicate that Congress intended to authorize such a wholesale expansion of class-action litigation.

*Id.* at 158–59, 102 S.Ct. at 2371. The Court further stated that "[t]he mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." *Id.* at 159 n. 15, 102 S.Ct. at 2371 n. 15. The Court advised district courts to carefully evaluate a plaintiff's claim that he is a proper class representative under Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 160, 102 S.Ct. at 2372. The same language from *Falcon* was relied upon by the Court last term in *Cooper v. Federal Reserve Bank of Richmond,* [467] U.S. [867], [876–77], 104 S.Ct. 2794, 2800, 81 L.Ed.2d 718 (1984).

The Eleventh Circuit recently had occasion to review a district court order denying class certification in a Title VII lawsuit. *See Morrison v. Booth,* 763 F.2d 1366 (11th Cir.1985). In that case the court stated:

> It [the district court] correctly concluded ... that while plaintiffs need not prove the merits of their claims at this [class certification] stage, they must provide more than bare allegations that they satisfy the requirements of Rule 23 for class certification. Plaintiffs must show some nexus with the alleged class. *See Waller [sic] v. The Jim Dandy Co.,* 638 F.2d 1330 (5th Cir.1981).... Plaintiffs simply leap from the premise that they were the victims of discrimination to the position that others must also have been.

*Id.* at 1371. *See generally Griffin v. Carlin,* 755 F.2d 1516 (11th Cir.1985); *Walker v. Jim Dandy Co.,* 747 F.2d 1360 (11th Cir.1984); *Giles v. Ireland,* 742 F.2d 1366 (11th Cir.1984).

With this background in mind, the court can address the question of whether the requirements of Rule 23 are met in the present case. This decision is committed to the discretion of the district court. *Califano v. Yamasaki,* 442 U.S. 682, 703, 99 S.Ct. 2545, 2558–59, 61 L.Ed.2d 176 (1979); *Griffin v. Carlin,* 755 F.2d 1516, 1531 (11th Cir.1985); *Perryman,* 698 F.2d at 1147.

The first four questions to be decided are (1) whether the class is so numerous that joinder of all members is impracticable, (2) whether there are questions of law or fact common to the class, (3) whether the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) whether the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition, the plaintiffs must satisfy one of the subdivisions of Rule 23(b). *Gilchrist v. Bolger,* 89 F.R.D. 402, 404 (S.D.Ga.1981). Here, the plaintiffs are proceeding under Rule 23(b)(2), and thus must show that Westinghouse "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

## A. Numerosity

■ In considering whether the numerosity requirement is satisfied, courts should examine the specific facts of each case. *General Telephone Co. of the Northwest v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980). The issue is whether joinder is impracticable. *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980). "Practicability of joinder depends on many factors, including, for example, the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Kilgo v. Bowman Transportation, Inc.,* 789 F.2d 859, 878 (11th Cir.1986). With regard to the size of the class, a plaintiff must do more than merely allege that numerosity is satisfied, but need not show the precise number of class members. *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 930 (11th Cir.1983).

■ The class here is composed of a *minimum* of 774 persons (the number of black employees hired from 1968 to 1977). *See* Affidavit of Shapiro at exhibit A–1. The class would also include all black persons employed at Westinghouse as of November 20, 1968. It should be possible to identify each class member from Westinghouse's personnel records. The class members who are still employed at Westinghouse can be easily contacted. Contacting the former employees will be more difficult. Hopefully, some of them can be contacted at the forwarding address on file at Westinghouse. However, it is unrealistic to assume that all former employees can be contacted this way. The current employees reside near Athens, Georgia, but it is impossible to know at this juncture where the former employees are located geographically. Considering all these factors and especially the size of the class, in this court's judgment the numerosity requirement is satisfied.

## B. Commonality and Typicality

The Supreme Court has noted that:

[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370–71 n. 13, 72 L.Ed.2d 740 (1982). The plaintiffs are thus "required to link [their] claim with those of the putative class by showing that the discrimination [they] allegedly suffered was typical or, relatedly, that a policy of race discrimination pervaded [Westinghouse's] practices." *Nelson v. United States Steel Corp.,* 709 F.2d 675, 679 (11th Cir.1983).

■ As to plaintiffs' disparate impact claim concerning the use of the General Aptitude Test Battery, the court notes that "[i]f [Westinghouse] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the com-

monality and typicality requirements of Rule 23(a)." *Falcon,* 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15. There is hardly a dispute that Westinghouse used such a test here. Thus, the commonality and typicality requirements are satisfied as to the disparate impact claim concerning the use of the GATB.

As to the disparate treatment claims of discrimination in initial assignments and promotions, the court must examine the named plaintiffs' and intervenors' situations to determine whether there is a class of employees that share common questions of law or fact and whether the individual's claims are typical of the class claims.

The two named plaintiffs are Major D. Calloway and James Moses. Mr. Calloway claims that Westinghouse refused to promote him to a position in the maintenance department and to several other positions because of his test scores. Mr. Moses also contends that he was discriminatorily denied promotions in the hourly bargaining unit and that he received inadequate training because of his race. Both Calloway and Moses are no longer employed at Westinghouse.

The four employees allowed to intervene as plaintiffs are Walter M. Culbreath, Sr., William Goss, Jimmy Byrd, and Robert Freeman. Mr. Culbreath claims he was discriminated against by being initially denied a position in the coil winding section of the hourly bargaining unit. He also complains because he was denied a promotion to dispatcher and because he was asked to fill in as a substitute foreman on only one occasion. Mr. Goss complains that he was denied a promotion to a moldmaker position in the hourly bargaining unit and to two salaried unit positions for which he had submitted a bid. Mr. Byrd believes he was discriminated against in his initial job assignment and again when he was denied participation in the maintenance training program. Mr. Freeman also complains that he should have been initially assigned to a higher labor grade. Intervenors Culbreath, Goss, and Byrd are current employees of Westinghouse; Freeman was laid-off.

█ These six individuals' claims are typical of the class claims. Furthermore, the anecdotal testimony by other employees and the plaintiffs' statistical evidence shows that there is a class of persons who were discriminated against in the same manner as the individuals, so that there are common questions of law or fact.

## C. Adequacy of Representation

█ Westinghouse's primary attack on class certification is its claim that the individual plaintiffs and intervenors are not adequately representing the class members.

The test of adequate representation in class action litigation brought under Rule 23, Fed.R.Civ.P. is whether the plaintiff's counsel is competent, and whether the interests of the named plaintiffs are not adverse to those of the class. A trial court has the continuing duty to undertake a stringent examination of the adequacy of representation by the named class representatives *and their counsel* at all stages of the litigation. The class action rule imposes on the trial judge the duty to assure that the interests of the class, including absentee class members, are adequately protected. The requirement of adequate representation, as applied to class action counsel is qualitative and not quantitative; in determining whether class counsel would afford absent class members adequate representation, it is proper to consider resources, and other demanding obligations of class counsel. When a potential conflict arises between the named plaintiffs and the rest of the class, the class attorney must not allow decisions on behalf of the class to rest exclusively with the named plaintiffs; in such a situation the attorney's duty to the class requires him to point out conflicts *to the court.*

The common thread running through the above cases is the federal judiciary's overriding concern that each member of

the class—named and absentee—is accorded adequate protection.

*Howard v. McLucas*, 87 F.R.D. 704, 705 (M.D.Ga.1980) (Owens, J.) (citations omitted) (emphasis in original). *See also Griffin*, 755 F.2d at 1533 ("The adequate representation requirement [of Fed.R.Civ.P. 23(a)] involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class.").

Plaintiffs' lead counsel in this case are partners David R. Sweat and Joseph P. Nelson of Athens, Georgia. They have tried several lawsuits before this judge, and to some extent they specialize in employment law. In this court's judgment, they have done an excellent job of representing the plaintiffs. The court is especially mindful of their thorough knowledge at trial of the facts of the case and their understanding of the statistical evidence.

However, Mr. Sweat and Mr. Nelson were not counsel of record until 1978. *See* transcript of pretrial conference held May 9, 1978, at 5. The earliest pleading in the file that contains one of their names is the motion for a class action order filed on June 8, 1978. The complaint was filed by attorney J. Hue Henry, and the amended complaint was filed by Mr. Henry and Mr. Kenneth Dious. On October 18, 1979, Jack Greenberg, O. Peter Sherwood, Clyde E. Murphy, and Patrick O. Patterson, who are on the staff of the NAACP Legal Defense and Educational Fund, Inc., filed a notice of appearance as additional counsel for plaintiffs. The Legal Defense Fund has an excellent nationwide reputation as experts in the representation of plaintiffs in employment discrimination lawsuits. On June 25, 1982, Mr. Patterson's motion for leave to withdraw as counsel was granted by the court. The proposed pretrial order filed on October 21, 1983, listed five attorneys for the plaintiffs: Mr. Nelson, Mr. Sweat, Mr. Henry, Mr. Dious, and Mr. Murphy. Only Mr. Sweat and Mr. Nelson participated in the trial.

Westinghouse contends that the "inordinate" delay in the prosecution of the case shows that the class members are not receiving adequate representation. The EEOC retained jurisdiction over the charge for eight years—from 1969 to 1977—prior to finding that there was reasonable cause to believe that discrimination occurred. This delay is attributable solely to the EEOC. The lawsuit was filed in 1977 but was not tried until 1985. This delay was caused by a number of factors, including the complexity of the case, the large volume of personnel files that had to be examined, and the extremely heavy caseload of the court. Although the case may have been tried sooner if Mr. Henry and Mr. Dious had been more aggressive in their discovery in the early stages of the lawsuit, any such delay is not so egregious as to constitute inadequate representation. In addition, the named plaintiffs' and intervenors' interests are not antagonistic to the interests of the other class members.

### D. Rule 23(b)(2)

The final hurdle to class certification is the requirement of Rule 23(b)(2) that: "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The Eleventh Circuit has noted that subsection (b)(2) is particularly applicable to employment discrimination class actions. *Giles v. Ireland*, 742 F.2d 1366, 1372 (11th Cir.1984); *accord Penson v. Terminal Transport Co.*, 634 F.2d 989, 993 (5th Cir.1981) (Unit B). In this court's judgment, Westinghouse's actions cause Rule 23(b)(2) to be applicable here.

### E. Final Class Action Status

As explained above, all the prerequisites to class certification under Rule 23(b)(2) are present. Accordingly, this lawsuit may be maintained as a class action whose members are all current and former black employees at Westinghouse's Newton Bridge

Road, Athens, Georgia, facility who were employed at any time after November 20, 1968.

## VI. Findings of Fact

Rule 52(a) of the Federal Rules of Civil Procedure requires the court to "find the facts specially and state separately its conclusions of law thereon." The court has divided its findings and conclusions into different categories for easier and clearer reading; however, the court considered all the evidence in determining the "ultimate factual issue"—whether Westinghouse intentionally discriminated against the plaintiffs on account of their race. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

"Ideally findings of fact should be clear, specific, and complete, without unrealistic and uninformative generality on the one hand, and on the other without an unnecessary and unhelpful recital of nonessential details of evidence." *Curtis v. Commissioner*, 623 F.2d 1047, 1051 (5th Cir.1980) (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2579 at p. 711 (1971)). The court has thus tried to make a finding on all the important facts. However, the court has not made a finding on every fact that it took into consideration in deciding whether there was a violation of Title VII and section 1981. Accordingly, the parties should keep in mind that the court has considered all the evidence in the case in making its ruling.

### A. Initial Job Assignment

1. Westinghouse's Athens facility was built in 1958 to manufacture overhead electrical transformers. Trial transcript at vol. II, p. 119.

2. The overhead transformer market is closely related to the economic conditions of the home building industry. Trial transcript at vol. II, p. 121. For this reason, demand for the product fluctuates widely and the number of employees working at the Athens facility depends upon market conditions. Peak employment at the Ath-

ens facility occurred in 1974. *Id.* Since 1974, there has been a steady decline in employment. *See* plaintiffs' exhibit A–1.

3. The employee work force at the Athens facility is divided into four general categories: hourly bargaining unit, salaried non-exempt unit, professional-technical, and management.

4. The hourly bargaining unit is divided into both occupational groups and labor grades. The labor grades are from one to seventeen, with labor grade one being the lowest paid labor grade and labor grade seventeen being the highest.

5. There are seventeen occupational groups. Each occupational group contains several labor grades. For example, occupational group one contains positions with labor grades of one through five. Defendant's exhibit 4.

6. The primary author of the job descriptions at Westinghouse was William S. Weber. Trial transcript at vol. II, pp. 58–59. Mr. Weber was a supervisor in the industrial relations department from 1958 to 1979. *Id.* at vol. II, p. 57. Mr. Weber's job descriptions constitute plaintiffs' exhibit J.

7. Jack E. McClary transferred to Westinghouse's Athens facility as Personnel Relations Manager in 1965. He has held that position continuously to the present. Trial transcript at vol. II, p. 118.

8. At all times relevant to this lawsuit, James Davis, Clay Jennings, or Gerry Flynn had the responsibility of hiring and initial job assignment.

9. The deposition of Mr. Davis was introduced at trial. Mr. Davis was supervisor of industrial relations from 1965 until his departure in 1971. Deposition of Davis at 3–4.

10. Davis testified that while he was in charge of hiring new employees, applicants were required to take the General Aptitude Test Battery (GATB). Deposition of Davis at 13. The test was administered by Georgia's State Employment Service, which later reported the applicants' scores or a

narrative of the score to Westinghouse. *Id.* at 41.

11. The GATB score was a factor on which Davis relied in making employment decisions. Deposition of Davis at 39.

12. Davis selected the applicants to be interviewed. As a result of the interview with Davis, some applicants were then referred by Davis to the first-shift supervisor of the department in which the vacancy existed. Deposition of Davis at 134.

13. Davis described labor grades one through six as requiring only "generic" qualifications. Deposition of Davis at 8–9 and 13.

14. When more than one applicant possessed the skills necessary for a vacant position, Davis decided who would be hired and where he or she would be placed based on his

> perception of the person's attitude during the interviewing process towards the kinds of questions that may be asked that would give me input about his attitude, about previous work that he had done, whatever, to get a feel for is this a person that's interested in learning and doing the job, being at work regularly, and those kinds of things both we find out through the interview process and where we could find out as much information from prior employment, and you can read some of that in the application itself.

Deposition of Davis at 138–39.

15. Clayton D. Jennings replaced Davis in 1971 as supervisor of industrial relations. Trial transcript at vol. III, pp. 40 and 48.

16. Jennings was in charge of hiring and initial job assignment of employees from 1971 until late 1973. Trial transcript at 40–41, 48.

17. Jennings' description of the hiring and initial job assignment process was essentially the same as the one given by Davis.

18. Westinghouse continued to use the GATB scores during the time that Jennings was in charge of hiring and initial job assignment. Trial transcript at vol. III, p. 44. Jennings testified that the test scores were used as only one part of the employment process because of the attention throughout the country on the invalidity of the use of test scores. *Id.*

19. James Gerry Flynn succeeded Jennings in late 1973 as head of interviewing applicants and hiring. It was also his responsibility to assign new employees to vacant positions. Trial transcript at vol. II, p. 95.

20. In general, the same procedure for interviewing and initial job assignment was used during Flynn's tenure. Trial transcript at vol. II, pp. 116–17.

21. However, Flynn testified that he also devised a scale of one to ten to evaluate applicants. Trial transcript at vol. II, p. 92. He indicated the applicant's rating on the application by, for example, the notation "R–7" if the applicant's rating was a 7. *Id.* at vol. II, pp. 91–92.

22. Flynn testified that an applicant's rating was a subjective decision. Trial transcript at vol. II, p. 92.

23. No black employee of Westinghouse had ever taken part in an initial job assignment decision until Conolus Scott became a first-shift supervisor in 1972. Trial transcript at vol. III, pp. 14 and 17.

24. Plaintiffs' revised statistics are set forth in the affidavit of Martin M. Shapiro, the plaintiffs' statistical expert.

25. Dr. Shapiro compared the initial assignment of employees into labor grades one through four with the initial assignment of employees into labor grades five and above. Affidavit of Shapiro at plaintiffs' exhibit A–1.

26. That analysis shows that for each of the years 1968 through 1973 there was a statistically significant overrepresentation of blacks in the lower labor grades and, conversely, there was a statistically significant overrepresentation of whites in the higher labor grades. Affidavit of Shapiro at 2 and at exhibit A–1.

27. In 1974, the comparison of initial assignment of blacks and whites was not statistically significant. Affidavit of Shapiro at 2 and at exhibit A–1.

28. In 1975, 1976, 1978, 1979, and 1980 no blacks were hired, making a statistical analysis impossible. Affidavit of Shapiro at exhibit A–1.

29. In 1977, the initial assignments of black and white employees were exactly proportional. Affidavit of Shapiro at 2 and at exhibit A–1.

30. Westinghouse contended at trial that certain "edge factors," which were held in greater numbers by white applicants than black applicants, accounted for the disparity in initial job assignments. Trial transcript at vol. III, pp. 197–98; defendant's proposed findings of fact and conclusions of law at p. 46, ¶ 130.

31. To contradict Westinghouse's contention regarding the edge factors, the plaintiffs introduced the personnel files of various employees to show that the alleged edge factors were not applied uniformly. Trial transcript at vol. II, pp. 98–99; plaintiffs' exhibits B and C.

32. The defendant objected to the admission of plaintiffs' exhibits B and C on the ground that they are judgment samples.

33. Plaintiffs' exhibits B and C compare the initial job assignment by labor grade of black and white employees hired at the same or approximately the same time. The personnel file for each of those employees is included in the exhibits. It is thus possible to determine whether the white employees possessed any such edge factor to possibly account for his or her higher labor grade assignment.

34. After carefully reviewing plaintiffs' exhibits B and C, it is clear that white employees were assigned to higher labor grades than black employees hired the same or nearly the same time, even though the white employees' personnel files revealed no edge factor that could possibly account for the difference in initial assignments.

35. In addition, the plaintiffs established that previous industrial experience or further education (which defendant claims are edge factors) were not required for positions in many of the labor grades.

36. Westinghouse's reliance on these edge factors—which it claims are held in greater numbers by white applicants than black applicants—knowing that the alleged edge factors were not necessary or even helpful for the labor grade jobs in question, shows that the edge-factor explanation is merely a pretext for discrimination.

37. Westinghouse also contends the plaintiffs' statistical evidence regarding initial job assignment is flawed because the analysis included craft, nonfungible positions that require skills not possessed or readily acquired by applicants. See defendant's proposed findings of fact and conclusions of law at pp. 123–24, ¶ 65.

38. Mr. Weber, the author of the job descriptions for all the hourly employee positions, testified that only a few of the positions with a labor grade of ten or below required prior specific work experience or specific vocational training. Trial transcript at vol. II, pp. 58–68.

39. Furthermore, Westinghouse's own data shows that there are statistically significant differences in initial labor grade assignments between black and white employees. Contrary to Dr. Siskin's testimony at trial, these results are not restricted to janitors and sweepers in labor grade one. Dr. Siskin's computer printout labeled J458 shows that *initial labor grade assignments into labor grades two through six (excluding labor grade one and all labor grades above six) have a statistically significant impact upon black employees.* Affidavit of Shapiro at 17–18.

40. Dr. Siskin conceded at trial that the statistics established that black employees were discriminatorily assigned to the janitor position in occupational group one. Trial transcript at vol. IV, pp. 19–20.

41. A number of Dr. Siskin's documents are misleading, distorted, or incomplete.

42. The court had the opportunity to observe Dr. Siskin testify over a two-day period. In particular, the court has observed his demeanor on the stand. Based on these observations, the court must conclude that Dr. Siskin is not a credible witness.

43. The court was so disturbed by Dr. Siskin's testimony that it directed him (as well as plaintiffs' expert witness, Dr. Shapiro) to submit all studies he had done that were in any way unfavorable to his client. Trial transcript at vol. IV, pp. 57–58. Computer printout number J458 was among the studies submitted at the request of the court. *See* finding of fact number 39.

44. The court also asked both expert witnesses to submit affidavits setting forth the amount of money they charged their respective clients.

45. Dr. Shapiro stated in his affidavit that he intended to bill the plaintiffs $9,875.00 total. Affidavit of Shapiro at 18. By comparison, Westinghouse paid Dr. Siskin *$253,416.58.* Affidavit of Siskin.

46. Of course, expert witnesses are almost always paid for their testimony. However, because Dr. Siskin's fee was so high in comparison to Dr. Shapiro's, it is obvious that Dr. Siskin has a greater financial interest in this litigation and, correspondingly, is less credible as a witness.

47. In addition to their statistical evidence, plaintiffs presented credible direct evidence of discrimination in initial job assignments.

48. Plaintiffs showed that from 1969 until 1974 the applications for hourly and nonexempt salaried positions were racially coded by placing a circle in the lower left-hand corner of the front page of the applications of black applicants.

49. McClary maintained that the practice of racial coding was instituted solely to obtain information for EEO purposes. Trial transcript at vol. II, pp. 8–9. In the court's best judgment, his testimony on racial coding is not credible.

50. Annie Louise Smith, a black female, filed a charge of employment discrimination with the EEOC against Westinghouse. McClary, who handled the investigation for Westinghouse, had no explanation as to why the racial coding on her application had been whited out. Plaintiffs' exhibit D at § I, pp. 6–8 (personnel file of Ms. Smith); trial transcript at vol. II, pp. 9–11.

51. Flynn was also unable to explain why the circle on Smith's application had been covered over. Trial transcript at vol. II, pp. 77–78.

52. If the racial coding had been done for legitimate EEO purposes, Westinghouse would have had no reason to cover up the circle on Smith's application.

53. By simply looking at the front of an application, the hiring supervisor could determine the applicant's race. In the court's judgment, Westinghouse used the racially coded information in a discriminatory fashion with regard to initial job assignment.

54. Someone wrote the word "white" on the upper lefthand corner of the employment application of Tommy Huff. Trial transcript at vol. II, pp. 79–80. Although someone has attempted to erase the word "white," it is still legible. *Id.* at 79; plaintiffs' exhibit D at § I, p. 10 (application of Mr. Huff).

55. The plaintiffs also produced direct evidence of discrimination in the form of written comments by Flynn on several employment applications. *See infra* findings of fact numbers 56–64.

56. Flynn wrote the following comment on Irene Perrin's application: "very impressive for a black clerical applicant." Plaintiffs' exhibit D at § I, p. 23. He also noted that Ms. Perrin "finished school in 11 years—'A' student throughout school—'B' [student] senior year (integrated with white school) but among top 25 of class." *Id.* at 22.

57. Flynn testified that he was unsure as to whether the remarks written on Ms. Perrin's personnel file were volunteered by Ms. Perrin or whether it was his own explanation of the decline in her grades. Trial transcript at vol. II, p. 86.

58. Irene Perrin Fortson testified more credibly that she did not discuss the information contained in the note with her interviewer. Trial transcript at vol. II, pp. 23–24. The conclusion that the integration of the high school she attended affected her grades must have been Flynn's own conclusion.

59. Flynn had no explanation for the note in his handwriting on the back of the application of Robert Willingham, whom he interviewed on March 13, 1974, which said "appearances O.K.; manner—conducts himself better than most blacks, refers to elders as 'Mr.' and those in authority as 'Mr.'; has been very persistent. Per chief, no record." Plaintiffs' exhibit D at § I, p. 33 (personnel file of Mr. Willingham); trial transcript at vol. II, pp. 90–91.

60. There was also no explanation as to why the personnel file of Willie Beck contained a copy of an EEOC charge that Beck had filed against a subsequent employer *after* his employment relationship with Westinghouse had terminated. Plaintiffs' exhibit D at § I, pp. 17–18.

61. Beck's personnel file also contained an unprocessed application for reemployment dated April 22, 1974, as well as a newspaper article from the *Athens Observer*, dated February 14, 1974, concerning Beck's charge against the Georgia Power Company. Plaintiffs' exhibit D at § I, pp. 19–20.

62. Flynn conceded that he wrote on the personnel file of Willie Randolph, "seems like a practical person, mature attitude, concerned about his future, *seems to have higher than average standards for black man.*" Plaintiffs' exhibit D at § I, p. 27; trial transcript at vol. II, p. 86–87.

63. When asked what he meant by his comment "seems to have higher than average standards for black man," Flynn replied:

Well, I think here again, I was impressed with him. I think he impressed me as being a probably more suitable candidate for employment than most of the blacks who came in to apply. ... I think it indicates that I had made an observation that among the applicants who came in to apply, that there weren't a lot of blacks who seemed to be good candidates for employment.

Trial transcript at vol. II, pp. 87–88.

64. Flynn was similarly unable to explain precisely what he meant by the phrase "impressive for black candidate" written by him on the back of the personnel application of George C. Bell. Plaintiffs' exhibit D at § I, p. 30; trial transcript at vol. II, p. 90.

65. The court must conclude that these notations were indicative of racially stereotypical views held by Flynn at the time they were written.

65a. The plaintiffs have proved the ultimate issue—that Westinghouse intentionally discriminated against blacks in making initial job assignments.

*B. Upgrading within the Hourly Unit*

66. The employees in the hourly bargaining unit are represented by the International Brotherhood of Electrical Workers. Trial transcript at vol. II, p. 123.

67. The upgrading of employees within the hourly bargaining unit was governed by Article XX of the collective bargaining agreements in effect during the years in question. Trial transcript at vol. II, p. 123; defendant's exhibit 5 at Article XX; defendant's exhibit 6.

68. The procedure to fill vacancies within the hourly workforce was changed in 1973, so there are two different procedures (one in effect prior to 1973 and one in effect in 1973 and afterwards) relevant to this claim.

69. Prior to 1973, persons within the occupational group in which a vacancy occurred were considered automatically in order of seniority. Trial transcript at vol. II, pp. 124–25.

70. At that time the employees were not required to submit a bid for the particular job. Trial transcript at vol. II, p. 124.

71. Instead, prior to 1973, employees in the occupational group where the vacancy

occurred were automatically considered if they were in a lower labor grade than the labor grade of the vacant position. Trial transcript at vol. II, pp. 124–25.

72. Employees in other occupational groups would be considered for the opening only after eligible employees in the same group were disqualified or declined the job. Trial transcript at vol. II, p. 125.

73. Beginning in 1973, all employees were required to have a current bid on file to be considered for an opening. Defendant's exhibits 5 and 6; trial transcript at vol. II, p. 125.

74. To submit a bid for a promotion or transfer, the employee had to obtain a bid slip from his own foreman, complete the form, and return it to the foreman for comments. It was then the foreman's duty to see that the bid slip was submitted to the personnel office. Deposition of Flynn at 42.

75. The bidding procedure is referred to as "prevacancy bidding." Trial transcript at vol. II, p. 127.

76. In 1973 and afterwards, the only employees considered for a particular opening were those whose bid for that position had been received by the personnel office prior to the personnel office's receipt of a requisition for an employee to fill an opening. Defendant's exhibits 5 and 6.

77. Employees could file new bids beginning on November 1 of each year and those bids were valid until December of the following year.

78. Thus, the personnel office had to have an employee's current bid on file as a prerequisite to considering that employee for an opening.

79. However, an employee could not file a valid bid until he or she had reached standard rate on their present job. Trial transcript at vol. II, p. 126; vol. III, p. 45.

80. After receiving a requisition for an opening, the supervisor of personnel sent to the supervisor of the section in which the vacant position occurred a list of employees that could be considered for the opening. Trial transcript at vol. III, p. 47.

81. Even after 1973, employees in the occupational group where the vacancy occurred were listed ahead of other employees. Defendant's exhibits 4 and 5.

82. There is no dispute that the seniority system did not have its genesis in racial discrimination and was not designed with any intent to discriminate against blacks. Trial transcript at vol. III, p. 64.

83. In addition, the system has not been maintained for a discriminatory purpose.

## C. Promotions from Hourly to Salaried

84. Plaintiffs contend that Westinghouse discriminated against blacks in promotions from the hourly bargaining unit into the salaried non-exempt unit.

85. The salaried non-exempt employees at the Athens plant are represented by an affiliate of the Federation of Westinghouse Independent Salaried Unions and have been covered by collective bargaining agreements. Trial transcript at vol. II, p. 122. However, Westinghouse does not contend that these agreements are seniority systems.

86. When an opening occurs in the salaried unit, employees already in the salaried unit are considered first. Trial transcript at vol. I, p. 206.

87. If the opening is filled by someone already in the salaried unit, the position formerly held by the promoted employee then becomes open.

88. So, eventually, an hourly employee can fill the other opening in the salaried unit. Trial transcript at vol. I, pp. 206–07. Mr. McClary (the personnel relations manager) testified that openings in the salaried unit were usually filled in this manner. *Id.* at vol. I, p. 207.

89. Hourly employees could bid on jobs in the salaried unit; however, those bids are different than the bids submitted for positions in the hourly unit.

90. Bids for positions in the salaried unit are simply an indication of the employee's interest in a position; they have no

contractual significance. Trial transcript at vol. I, p. 208 and vol. II, pp. 3–4.

91. Having a bid on file is not a prerequisite to being considered for an opening. Trial transcript at vol. I, p. 208.

92. The supervisor of the department where the vacancy occurs has the primary responsibility for the selection decision. Trial transcript at vol. I, p. 208; deposition of McClary dated November 9, 1979, at 61.

93. Until 1972, none of the supervisors were black. Plaintiffs' exhibit E. Thus, the decision of who would be promoted was made by whites.

94. The supervisors relied in part on a confidential rating sheet in making their decisions. Trial transcript at vol. I, pp. 209–10. The rating sheet was completed by the employee's immediate foreman. *Id.* The employee's test scores were included on the rating sheet. *Id.*

95. In 1972, Westinghouse discontinued administering the test to applicants; however, the test scores were not removed from the files of employees who had previously been required to take the test. Trial transcript at vol. I, p. 212.

96. The plaintiffs' statistical evidence consists of plaintiffs' exhibits A–5 through A–8 (as amended), which are attached to the affidavit of Dr. Shapiro.[4]

97. All four of these exhibits compare the progress of black and white hourly employees who were initially assigned to the same labor grade. Plaintiffs' exhibit A–5 compares white and black employees hired in 1970 and initially assigned to labor grades four, five, and six. Plaintiffs' exhibit A–6 makes the same comparison for the year 1971; plaintiffs' exhibit A–7 is for 1972; and plaintiffs' exhibit A–8 is for 1973.

98. Plaintiffs' exhibit A–5 shows that for these cohort groups whites advanced more rapidly during the period 1971 through 1980. *See* Affidavit of Shapiro at 6–7. Plaintiffs' exhibits A–6, A–7, and A–8

show the same pattern as A–5. *See* Affidavit of Shapiro at 7–9.

99. The plaintiffs also presented anecdotal testimony by eight employees or former employees of Westinghouse. *See* findings of fact numbers 111–18 (testimony of Goss); 119–24 (testimony of Ellison); 125–29 (testimony of James); 136–44 (testimony of Stevens); 145–50 (testimony of Stephens); 151–56 (testimony of Calloway); 183–86 (testimony of Butler); 187–92 (testimony of Fortson).

100. In this court's judgment the plaintiff class has proved that Westinghouse intentionally discriminated against blacks in promoting employees from the hourly unit to the salaried unit.

### D. Promotions to Supervisor

101. Next, the plaintiffs contend that Westinghouse discriminated against blacks in the selection of supervisors.

102. Supervisors were selected by the manager of the area in which the vacancy occurred. Deposition of McClary dated Mar. 7, 1979, at 37–39; deposition of McClary dated Nov. 9, 1979, at 73–76.

103. If the employee had acted as a substitute or fill-in supervisor in the past, the manager took into consideration the employee's performance while serving in that capacity. Trial transcript at vol. II, pp. 5–6.

104. The GATB test scores were also considered. Trial transcript at vol. I, pp. 211–12.

105. The plaintiffs' evidence consists primarily of Westinghouse's EEO–1 reports. *See* plaintiffs' exhibit E.

106. Those reports show that there were no black supervisors or managers at Westinghouse until 1972. Plaintiffs' exhibit E.

107. In 1972, Conolus Scott and Joseph Hester were made supervisors in the same week. Trial transcript at vol. III, p. 12.

107a. Westinghouse's expert witness, Dr. Siskin, conceded that race did play a

---

4. The plaintiffs' statistical exhibits are also attached to this order as Addendum 1.

role in the selection of supervisors up until 1972. Trial transcript at vol. III, pp. 172–73. He testified that until 1972, the probability that a black would be promoted to supervisor was zero. *Id.* at 173.

108. All the managers who decided who would receive the supervisory positions were white.

109. The decision was a totally subjective one. Deposition of McClary dated Nov. 9, 1979, at 74–77.

110. The plaintiffs also presented anecdotal testimony about promotions to supervisor. *See* findings of fact numbers 119–24 (testimony of Ellison), 136–44 (testimony of Stevens), 145–50 (testimony of Stephens), and 171–82 (testimony of Culbreath).

### E. Anecdotal Testimony on Promotions [5]

*William Goss*

111. William Goss testified that he was hired in 1965 as a sweeper/janitor in labor grade one. Trial transcript at vol. I, p. 84.

112. He is still employed by Westinghouse, now as an insulation cutter in labor grade seven. *Id.*

113. In 1970, he was disqualified for a moldmaker position (labor grade ten) because he could not read a blueprint. *Id.* at 84–85. He says the white supervisor did not give him enough time to be able to read the blueprint. *Id.* at vol. I, p. 85.

114. He testified that a white employee (Howard Minish) was placed in the moldmaker opening. *Id.* at vol. I, p. 86. However, Minish held that position for only a short time and was then succeeded by a black (Willie Gatlin). *Id.* at vol. I, p. 92.

115. Goss testified that at the time the moldmaker opening occurred, when a position within an occupational group became open, Westinghouse had to first look within that occupational group for a replacement. *Id.* at vol. I, pp. 91–92. He further testified that that was how he was approached

about the moldmaker opening. *Id.* at vol. I, p. 92.

116. In the early 1970s, Goss bid on two salaried positions (dispatcher and quality control). *Id.* at vol. I, pp. 86–87. White employees received both those promotions. *Id.* at vol. I, p. 88.

117. Goss stated that he had been offered a position as a maintenance mechanic, which required participation in a training program. *Id.* at vol. I, pp. 88, 98–99. He declined the offer because he could not afford the temporary cut in pay. *Id.*

118. He does not think Westinghouse's bid system is unfair. *Id.* at vol. I, p. 95.

*Isaiah Ellison*

119. Plaintiff-intervenor Isaiah Ellison was hired in 1971 as a tank line helper in labor grade one. Trial transcript at vol. I, pp. 104, 110. He is no longer employed at Westinghouse. *Id.* at vol. I, p. 104.

120. He testified that he bid for positions in quality control, traffic control, the salvage department as an accounting clerk, and as an inspector, but did not receive those positions. *Id.* at vol. I, p. 105.

121. He did receive four other promotions for which he submitted bids. *Id.* at vol. I, pp. 110–11.

122. He also voiced a desire to be a foreman. *Id.* at vol. I, p. 105.

123. He was acting foreman in the preliminary assembly section, but when a foreman opening occurred, a white employee (Don Pittard) was promoted instead. *Id.* at vol. I, p. 106.

124. He testified that Gerry Flynn offered him a foreman position on third shift, but he declined the offer because the third shift conflicted with his class schedule at the University of Georgia. *Id.* at vol. I, pp. 108, 112.

*Willie James*

125. Willie James, who is presently employed by Westinghouse in tool and die setup at labor grade ten, testified about his experience in bidding for salaried positions.

---

5. When the court states that an employee testified to a particular fact and when that testimony is without contradiction, the court accepted the testimony as true.

126. James was initially assigned the position of punch press operator (labor grade six). Trial transcript at vol. I, p. 118.

127. He bid on several salaried-unit jobs, including production dispatcher and inspector. *Id.* at vol. I, p. 127.

128. He says that whites with less seniority received most of the promotions he applied for. *Id.* at vol. I, p. 120.

129. He testified that he acted as fill-in supervisor and trained some of the whites who received the promotions. *Id.* at vol. I, pp. 120–22.

*Jimmy Byrd*

130. Plaintiff-intervenor Jimmy Byrd is presently employed at Westinghouse as a maintenance mechanic in labor grade fifteen. Trial transcript at vol. I, p. 132.

131. He was hired in 1969 and initially assigned the position of tank line machine operator in labor grade six. *Id.*

132. Byrd testified that he believes he was discriminated against in his initial job assignment; he contends he should have started in labor grade seven instead of labor grade six. *Id.* at vol. I, pp. 132, 136.

133. He also testified that he was discriminated against in 1972 when he was denied participation in the maintenance training program. *Id.* at vol. I, pp. 134–35. White employees received that upgrading. *Id.*

134. The next year (1973) he applied again—this time successfully—for an opening in the maintenance training program. *Id.*

135. Byrd testified that he eventually received every position that he sought at Westinghouse. *Id.* at vol. I, p. 141.

*Captain Dozier Stevens*

136. Captain Dozier Stevens was hired by Westinghouse in 1970. Trial transcript at vol. I, p. 144, 149. He is still employed there. *Id.* at vol. I, p. 151.

137. He was initially assigned to a building job in core coil assembly at labor grade six. *Id.* at vol. I, pp. 144, 149.

138. In 1974, he submitted a bid to his supervisor for an inspector's position in the salaried unit. *Id.* at vol. I, pp. 144–45. However, his supervisor threw the bid into the trash can. *Id.*

139. As to his supervisor's motive for throwing away the bid, Stevens testified:

Q Have you ever been discouraged from bidding on a job?

A Yes, a lot of supervisors ask you, "you don't want that job." They want to keep a good man and I think I'm a good man.

Q Is that what happened to you on that production dispatcher's job when the fellow rolled it up and threw it in the can?

A No. It probably was.

Q You think he probably wanted a good employee in his section?

A I would think so.

Q You don't think he did it because you're black, do you?

A I really couldn't say he did it because I was black; like I said, he did it.

*Id.* at vol. I, pp. 151–52.

140. From 1974 to 1977, Stevens periodically acted as foreman. *Id.* at vol. I, pp. 145–46.

141. He testified that he thought he acted as substitute foreman in anticipation of being promoted to a permanent supervisory position. *Id.* at vol. I, p. 147.

142. However, he was not promoted despite the fact that three supervisory openings occurred during that time frame. *Id.* at vol. I, p. 146.

143. Stevens and a few other employees complained to management about the filling of one of the supervisor positions (the one that was filled by Larry Smith). *Id.* at vol. I, p. 147.

144. He further testified that he received every job in the hourly bargaining unit for which he bid. *Id.* at vol. I, p. 151.

*Ernest Stephens*

145. Ernest Stephens became an employee of Westinghouse in 1966. Trial transcript at vol. I, p. 155. His first job there was material handler at labor grade three. *Id.* at vol. I, pp. 155–56.

146. He testified that he was not offered three positions in which he was interested. *See infra* findings of fact numbers 147–49.

147. In 1967, he bid for a labor grade six position as a machine operator on tank line. *Id.* at vol. I, p. 156. This would have been a transfer within the hourly bargaining unit. *Id.* at vol. I, p. 157. He was told that he was disqualified for the position. *Id.* at vol. I, p. 156.

148. He also bid for a job in the salaried unit as an inspector. *Id.* at vol. I, p. 157. He testified that he was told he was disqualified because he did not have a high school diploma. *Id.*

149. Stephens also said he had expressed an interest in becoming a supervisor, but he was never offered a supervisory position. *Id.* at vol. I, p. 159.

150. He had acted as a fill-in supervisor on occasion from 1973 to 1978 or 1979. *Id.* at vol. I, p. 159.

*Major Calloway*

151. Major Calloway is a named plaintiff in this lawsuit.

152. Calloway was employed at Westinghouse from 1964 until 1969. Trial transcript at vol. I, p. 165.

153. He was initially assigned to labor grade one as a sweeper/janitor. *Id.* at vol. I, p. 161.

154. Calloway testified that he wanted to be upgraded to a position in the maintenance department, but the foreman told him he was not qualified because of his test scores. *Id.* at vol. I, p. 162.

155. He told management that he was interested in other jobs as well. *Id.* at vol. I, pp. 163–64. Two positions that he was interested in (quality control and dispatcher) were in the salaried unit. *Id.* at vol. I, p. 163. He was told that he was disqualified for those two positions because of his test scores. *Id.*

156. He testified that he left Westinghouse in 1969 because "I wasn't earning enough money to support my family and I figured my chances of moving up was slim." *Id.* at vol. I, p. 165.

*Robert Freeman*

157. Robert Freeman began work at Westinghouse in 1973. Trial transcript at vol. I, pp. 167, 174. He was initially assigned to block and braize in labor grade four. *Id.*

158. He testified that he should have been initially assigned to a higher labor grade. *Id.* at vol. I, p. 168.

159. In 1977, he bid on a job as a die cone operator. *Id.* at vol. I, pp. 169, 174–75. The die cone operator position is at labor grade five. *Id.* at vol. I, p. 171.

160. If his bid had been successful, he would have received an upgrading within the hourly bargaining unit.

161. Freeman testified as follows concerning his perception of why he was not offered the die cone operator position:

Q Are you contending that the reason Mr. Richards got the job and you didn't was because you're black?

A I didn't say that.

Q Excuse me?

A I didn't say that. I don't know why he got the job.

Q But you're not contending it's because he was white and you're black, are you?

A I'm not saying that; I didn't say that.

Trial transcript at vol. I, pp. 175–76.

162. He also bid unsuccessfully for another position in the wire tower. *Id.* at vol. I, pp. 173–74.

163. Freeman was subsequently laid off by Westinghouse. *Id.* at vol. I, p. 174.

*James Moses*

164. James Moses is a named plaintiff in this lawsuit.

165. Moses was hired in 1965 and was initially assigned to labor grade one as a sweeper. Trial transcript at vol. I, p. 178.

166. In 1966, he was disqualified from a job in coil winding because his test score was not high enough. *Id.* at vol. I, pp. 178–79.

167. He took the test again and was then offered the job. *Id.* at vol. I, pp. 179–80.

168. He testified that he received inadequate training because of his race. *Id.* at vol. I, p. 180.

169. He also bid unsuccessfully on other jobs. *Id.* at vol. I, p. 181.

170. Moses is no longer employed by Westinghouse. *Id.* at vol. I, p. 182. He testified that he left because he was not treated fairly and he found a better paying job. *Id.* at vol. I, pp. 182–83.

*Walter M. Culbreath, Sr.*

171. Walter M. Culbreath, Sr. became a Westinghouse employee in 1958. Trial transcript at vol. I, p. 191. He is an intervenor-plaintiff in this lawsuit. His initial assignment was bathroom detail in labor grade one. *Id.*

172. He is still employed by Westinghouse, now as a training technician in coil winding at labor grade nine. *Id.*

173. When Culbreath expressed an interest in working in the coil winding section, his supervisor told him he was not qualified and that he had to take the test again. *Id.* at vol. I, p. 192.

174. He took the test again and was then told by his supervisor (Chester Bartholomew): "You passed all qualifications. The only problem I have that I can't—I never have worked people together in the South, is only thing." *Id.* at vol. I, p. 192.

175. Culbreath testified that he also had problems becoming a winding technician. *Id.* at vol. I, p. 195.

176. After he was offered and he accepted the winding technician opening, his supervisor (Randy Armour) told him that he could not let him have the job because "some people's talked with me and there's going to be some problems because you're going to have to train some white ladies and I can't let you have the job." *Id.* at vol. I, p. 195.

177. Culbreath talked with two persons in management about his situation, and was then allowed to have the job. *Id.* at vol. I, p. 196.

178. In 1968, he bid unsuccessfully for a dispatcher job. *Id.* at vol. I, p. 196; *see* plaintiffs' exhibit F at vol. II, § I, p. 34.

179. When Culbreath asked why he was not offered the position, he was told that he was not qualified and that his personnel file did not contain any test scores. Trial transcript at vol. I, pp. 197–98.

180. In fact, Culbreath had taken three different tests and each of those scores should have been in his file. *Id.* at vol. I, p. 198.

181. Culbreath also testified that he had not been asked to be acting supervisor except on one occasion. *Id.* at vol. I, p. 199; *see* plaintiffs' exhibit F at vol. II, § I, p. 40 (memo concerning Culbreath's bonus payment for substituting for a foreman).

182. However, whites in lower labor grades were the ones who filled in as substitute foremen. Trial transcript at vol. I, pp. 199–200.

*Robert Lee Butler, Jr.*

183. Robert Lee Butler, Jr. was hired by Westinghouse in 1971 as a tank line operator (labor grade six). Trial transcript at vol. II, p. 33.

184. He is presently assigned to labor grade twelve as an industrial truck repairman. *Id.* at vol. II, p. 34.

185. Butler testified that he was interested in the skilled trades positions, specifically in the tool room and the drafting room. *Id.* at vol. II, pp. 34–36. However, Westinghouse placed whites in all the openings that occurred. *Id.* at vol. II, pp. 35–36.

186. He also testified that he unsuccessfully bid for a job in quality control and for a dispatcher's position. *Id.* at vol. II, p. 36. The plaintiffs did not establish who received those positions.

*Horace V. Fortson*

187. Mr. Fortson is no longer employed by Westinghouse. He was a Westinghouse employee from 1967 to 1969. Trial transcript at vol. II. pp. 45, 49.

188. He was initially assigned to the position of coil winder in labor grade six. *Id.* at vol. II, pp. 44, 49.

189. Mr. Fortson voluntarily left Westinghouse for a better paying job. *Id.* at vol. II, pp. 45, 49–50.

190. He testified that he bid for an electronic tester position and for an inspector's position, but white employees filled all the openings. *Id.* at vol. II, pp. 45–46.

191. He reapplied at Westinghouse within a year after he left, but he was not rehired. *Id.* at vol. II, pp. 46–47.

192. Mr. Fortson was one of the persons who filed the EEOC charge against Westinghouse. *Id.* at vol. II, p. 47.

*Willie L. Gatlin*

193. Mr. Gatlin was hired by Westinghouse in 1958. Trial transcript at vol. II, p. 52. His initial assignment was in labor grade two as an equipment cleaner. *Id.*

194. At the present time, he is a mold maker in labor grade ten. *Id.* at vol. II, p. 52.

195. He testified that he was disqualified from positions in (1) core coil assembly, (2) block and braizer, and (3) coil winding. *Id.* at vol. II, p. 52.

### F. General Aptitude Test Battery

196. The plaintiffs' case is also based upon the disparate impact theory. The plaintiffs claim that the use of the General Aptitude Test Battery (GATB) adversely impacts upon blacks.

197. From 1964 through 1969, only the applicants' raw scores on the test were reported. After 1969, the raw scores were converted into converted scores.

198. The GATB contained nine tests; however, only four of the tests (tests five, six, eight, and nine) were administered to a large number of employees.

199. Apparently, only those employees hired by Mr. Davis took all nine tests in the GATB. Deposition of Davis at 39. Mr. Davis was in charge of hiring and initial job assignments from 1965 to 1971.

200. Plaintiffs' exhibit A–10 is an analysis of the differences between mean scores for black and white applicants. (Westinghouse did not keep records of the test scores of applicants who were not hired; thus, all scores are for applicants who were actually hired.) Trial transcript at vol. I, pp. 23–24.

201. Plaintiffs' exhibit A–10 shows that black applicants score lower than white applicants on three of the four tests. Trial transcript at vol. I, p. 24; affidavit of Shapiro at 12–13. These results are statistically significant. *Id.*

202. The difference between the performance of white and black employees on test nine is not statistically significant. Affidavit of Shapiro at 13 and at plaintiffs' exhibit A–10. Test nine is a test for manual dexterity.

203. The multiple regression analysis in plaintiffs' exhibit A–11 shows that the strongest predictor of a person's initial labor grade assignment is his or her race. Trial transcript at vol. I, p. 25. However, the employee's score on tests six and nine also predicts initial assignment to a statistically significant level. *Id.*

204. Westinghouse did no statistical studies and presented no statistical evidence to contradict plaintiffs' evidence that black employees scored significantly lower than white employees on the GATB.

205. Westinghouse required its applicants to take the GATB until mid–1972. Trial transcript at vol. I. p. 211. In mid–1972, Westinghouse discontinued that requirement because it had found that there was no correlation between test scores and daily output of work. Trial transcript at vol. II, p. 142.

206. However, the test scores were not removed from the employees' personnel records and were thus available to supervisors after 1972. Trial transcript at vol. I, p. 212.

207. The test scores were, at least on some occasions, written on the employees' confidential rating sheets. Trial transcript

at vol. I, p. 211. These rating sheets were used to determine who would be promoted.

208. There is no dispute that Westinghouse used the test scores to disqualify some employees from receiving a promotion. Trial transcript at vol. I, p. 214.

209. The test scores were relied upon by Westinghouse to decide who would be promoted within the hourly unit, from the hourly unit to the salaried unit, and to supervisor.

## VII. Conclusions of Law

### A. Initial Job Assignments—Disparate Treatment Theory

■ In a class action lawsuit, the plaintiffs can establish a prima facie case of discrimination by establishing "by a preponderance of the evidence 'that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876, 104 S.Ct. 2794, 2800, 81 L.Ed.2d 718 (1984) (quoting *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). *See also Maddox v. Claytor*, 764 F.2d 1539, 1556–57 (11th Cir.1985). The plaintiffs must prove discriminatory motive or intent. *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–55 n. 15. The three-part burden of proof framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), does not apply to class actions. *Maddox*, 764 F.2d at 1557; *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1143 (11th Cir.1983). Thus, the usual procedure is to consider the evidence as a whole to determine whether the plaintiffs have established a pattern and practice of discrimination. *Perryman*, 698 F.2d at 1143.

■ The prima facie case may be established by statistics alone if they are sufficiently compelling. *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984); *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 618 (11th Cir.1983). Even when the statistical evidence is sufficiently strong, the prima facie case is bolstered if the plaintiffs present "anecdotal evidence to '[bring] the cold numbers convincingly to life.'" *Eastland*, 704 F.2d at 618 (quoting *Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856). The plaintiff class in the present case relied on both statistics and testimony by individuals about their personal experiences at Westinghouse.

■ The plaintiffs' statistical evidence of discrimination in initial job assignments consists of plaintiffs' exhibits A–1 and A–2 and Dr. Shapiro's testimony about those exhibits. This evidence is discussed in the court's findings of fact numbered 24–29. To summarize, plaintiffs' exhibit A–1 shows that for each year from 1968 through 1973, there was a statistically significant overrepresentation of blacks in labor grades one through four and, conversely, a statistically significant overrepresentation of whites in the higher labor grades, five through seventeen. As stated earlier, the prima facie case may be established by statistics alone if they are sufficiently compelling. The Eleventh Circuit has held that an F-value of 4 or a probability level of .05 is accepted as statistically significant. *Eastland*, 704 F.2d at 622 n. 12. *Accord McCleskey v. Zant*, 580 F.Supp. 338, 350 (N.D.Ga.1984), *aff'd sub nom. McCleskey v. Kemp*, 753 F.2d 877 (11th Cir.1985). Plaintiffs' statistics are statistically significant for the years 1968 through 1973. Finding of fact number 26. Accordingly, the plaintiffs' statistical evidence alone could establish the prima facie case.

In addition, with regard to initial assignment the plaintiffs presented the testimony of three employees or former employees of Westinghouse. *See* findings of fact numbers 130–135 (testimony of Byrd), 157–163 (testimony of Freeman), and 56–58 (testimony concerning Fortson). These individuals testified about their personal experiences with discrimination at Westinghouse. For example, Ms. Irene Perrin Fortson testified that she was hired in 1974 as a cleri-

cal worker in the salaried unit. She had sought an assignment in the accounting or secretarial area, but instead was assigned to file blueprints and do errand work. Flynn, who was the supervisor who interviewed her and made her initial job assignment, wrote on her application: "finished school in 11 years—'A' student throughout school—'B' [student] senior year (integrated with white school) but among top 25 of class." Finding of fact number 56. Flynn apparently attributed the decline in Ms. Fortson's grades to the integration of her high school. Ms. Fortson testified that she was referred to at Westinghouse as "the colored girl in the office."

Flynn testified that Fortson was not placed in the front office because there were no vacancies at that time. However, three white individuals were hired as accounting clerks or receptionists after Ms. Fortson submitted her application to Westinghouse.

The plaintiff class also introduced direct evidence of discrimination in the form of racial coding of employment applications and comments written by the supervisor who made the initial job assignments. The comments and racial coding are clear, direct evidence that Westinghouse took into account the applicant's race when deciding whether to hire and, if so, the initial job assignment. (The plaintiffs do not allege in this case that they were discriminated against in hiring.)

If direct evidence exists in a case, the defendant bears a heavier burden. *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875 (11th Cir. 1985). There is no question that there is direct evidence of discrimination in this case. *See, e.g., Miles,* 750 F.2d at 874 (direct evidence was testimony at trial that "I asked Olin Henderson [who was in charge of hiring and firing] why they didn't have any blacks. He said, 'Half of them weren't worth a shit.' "); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983) (direct evidence was statement by employer's decision maker that he would not allow plaintiff into the washroom department because if she were al-

lowed in, all women would want to enter); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774–75 (11th Cir.1982) (direct evidence was evidence that school board members and a past principal sought to maintain a "white presence" and stop white flight, and urged others to "build cases" against black teachers).

■ In employment discrimination cases that are *not* class actions, once direct evidence of discrimination is established, the defendant must prove by a preponderance of the evidence that it would have reached the same decision (for example, refusal to hire) even absent the discriminatory motive. *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1498 n. 4 (11th Cir. 1985). However, this case is a class action. Schlei and Grossman have written that clear evidence of the employer's intent has been used to support the plaintiffs' claims in a disparate treatment class action lawsuit. B. Schlei & P. Grossman, *Employment Discrimination Law* 268–69 (2d ed. Supp.1983–84).

For example, in *Domingo v. New England Fish Co.,* 727 F.2d 1429 (9th Cir.1984), the Ninth Circuit considered direct evidence of discrimination in the context of a disparate treatment class action. The employer in that case labeled work crews by race. Job titles were "Fil. [ipino] Crew—1st Foreman," "Fil. Crew—Inspector," "Native Cannery Foreman," and "White Bull Cook." *Id.* at 1433. The court considered this evidence of discrimination in deciding whether the plaintiff class had proved discrimination. *Id.* at 1436 ("These facts, combined with Nefco's [the employer's] use of racial labels for certain job categories and evidence of specific acts of discrimination, established intentional employment discrimination.").

This court has thus taken into account Westinghouse's racial coding of employment applications and the comments written by Flynn on some employment applications in deciding whether Westinghouse had a pattern and practice of racial discrimination in initial job assignments.

Finally, plaintiffs have proved that the decision of where a new employee would be initially assigned was to some extent a subjective one made entirely by whites. The former Fifth Circuit has recognized that:

procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action.

*Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir.1972). The Eleventh Circuit has recently stated that they "have repeatedly held that subjective practices such as interviews and supervisory recommendations are capable of operating as barriers to minority advancement." *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985) (citations omitted).

The plaintiff class in the present case has established that the initial job assignment decision was made exclusively by white supervisors until 1972 when Colonus Scott became a first-shift supervisor. Finding of fact number 106–107. In addition, the decision was based in part on personal interviews with the applicant. Furthermore, all three individuals who made the initial job assignment decisions during the period at issue (Davis, Flynn, and Jennings) admitted that their decisions were at least partially based on subjective criteria. Mr. Flynn rated the applicants on a scale of one to ten. Finding of fact number 21. He testified that an applicant's rating was determined by a subjective decision. Finding of fact number 22. Mr. Davis also testified that he made employment decisions based on his perception of the person's attitude. Finding of fact number 14.

Through their statistical evidence, anecdotal testimony, direct evidence of discrimination, and evidence of subjective practices, the plaintiffs have without doubt established "that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855.

When the plaintiff class establishes a pattern-or-practice of racial discrimination, the burden shifts to the employer "to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360, 97 S.Ct. at 1867. In the Eleventh Circuit,

[o]nce plaintiff establishes a prima facie case of disparate treatment, the burden shifts to defendant to rebut the inference of discrimination by showing that plaintiffs' statistics are misleading or by presenting legitimate non-discriminatory reasons for the disparity. The defendant does not have to persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant raises a genuine issue of fact as to whether it discriminated.

*Griffin*, 755 F.2d at 1525–26 (citation omitted).

Schlei and Grossman have commented that classifying the defendant's statistical evidence as a defense to an already established prima facie case, as the Eleventh Circuit does, is erroneous. B. Schlei & P. Grossman, *Employment Discrimination Law* 1323 n. 102 (2d ed. 1983). Instead, they maintain that a successful attack on the validity of the plaintiffs' statistics precludes the establishment of the prima facie case. *Id.* This court agrees with Judge Higginbotham, who has written that the characterization of the defendant's attack on the plaintiffs' statistics as a defense to an already established prima facie case or as a factor preventing a prima facie case from ever coming to existence is simply a matter of semantics. *Vuyanich v. Republic National Bank of Dallas*, 505 F.Supp. 224, 357 n. 170 (N.D. Tex.1980). However, because this court is bound by Eleventh Circuit precedent, the *Griffin* description of the defendant's burden will be followed.

Westinghouse attempted to show that the plaintiffs' statistical evidence regarding initial job assignments is misleading because it includes nonfungible or craft positions. Plaintiffs' statistical exhibit A–1 is a count of the initial placement of whites and blacks in labor grades for each year from 1968 to 1980. Dr. Shapiro compared the placement of whites and blacks in labor grades one through four with the placement of whites and blacks in labor grades five and above. Westinghouse argues that these statistics are misleading because they include craft jobs which require skills not possessed or readily acquired by the general population. Citing *United Steelworkers of America v. Weber*, 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2725 n. 1, 61 L.Ed.2d 480 (1979), Westinghouse pointed out that whites disproportionately possess craft experience. Defendant's proposed findings of fact and conclusions of law at p. 46, ¶ 129. Thus, Westinghouse urges the court to conclude that the plaintiffs' statistics are invalid because they are based on the assumption that all new employees were qualified for labor grades one through seventeen, when in fact they were not.

■ The defendant's argument would be a good defense if it were in fact true, but it is not. First, the testimony at trial established that almost all occupational groups in the hourly bargaining unit required no skills other than those that could be learned after a short period on the job. Finding of fact number 38. This is not to say that the testimony on that question was not conflicting at trial. However, in this court's best judgment, the person most qualified to identify the jobs requiring skills was Mr. Weber, who was the primary author of the job descriptions at Westinghouse. Finding of fact number 6. Accordingly, the plaintiffs' statistics are not misleading because of the inclusion of all labor grades and occupational groups in the hourly bargaining unit.

More importantly, even if the defendant's argument was correct, there is still statistical evidence of discrimination in initial job assignments in the form of Westinghouse's own computer data. Dr. Siskin's computer printout number J458 shows that initial grade assignments into grades two through six (excluding labor grade one and all labor grades above grade six) have a statistically significant impact upon blacks. Finding of fact number 39.

Computer printout J458 was submitted after trial in response to the court's direction to Dr. Siskin to file all studies he had done that were unfavorable to Westinghouse. Finding of fact number 43. The printout directly contradicts Dr. Siskins' story at trial. Finding of fact number 39. The court has also noted Dr. Siskin's financial interest in the litigation and his demeanor at trial. Finding of fact numbers 42–46. Consequently, these cumulative factors have convinced the court that Dr. Siskin is not a credible witness.

The plaintiffs further allege that Dr. Siskin's testimony in the present case is different than his testimony in *Equal Employment Opportunity Commission v. Sears, Roebuck & Co.*, 628 F.Supp. 1264 (N.D.Ill.1986). Specifically, they contend that in this case Dr. Siskin testified that statistical data should not be aggregated, but in the *Sears* case he testified that aggregation is proper. Trial transcript at vol. III, pp. 192–93.

Inconsistent testimony by an expert witness is a serious matter. *See Harre v. A.H. Robins Co.*, 750 F.2d 1501, 1505 (11th Cir.1985). It not only undermines the substance of the expert's testimony, but it also reflects on the expert's credibility.

To establish that Dr. Siskin testified differently, the plaintiffs must do more than simply allege a difference in the testimony. Instead, they must introduce into evidence the actual testimony given in the prior trial. Only then can the court consider the testimony and decide whether it is in fact inconsistent.

At trial, plaintiffs' counsel did not introduce Dr. Siskin's testimony in *Sears, Roebuck & Co.* Indeed, it appears that at that time plaintiffs' counsel had not even seen a transcript of Dr. Siskin's *Sears* testimony.

On July 16, 1986, the court asked plaintiffs' counsel to advise the court as to exactly what testimony is contradictory. The court subsequently received a copy of Dr. Siskin's *Sears* testimony from plaintiffs' counsel.

After reviewing Dr. Siskin's testimony in the two cases, the court must conclude that the testimony is not inconsistent. He did not testify in *Sears* that aggregation should always be done. Instead, he testified that based on the facts of that case, aggregation was appropriate. He then testified in the present case that aggregation was improper based on the facts of this case. Therefore, the court's view of Dr. Siskin's credibility is not based on his allegedly inconsistent testimony in the *Sears* case.

Statistical evidence, like any other circumstantial evidence admitted during a trial, should not be accepted uncritically. *See Teamsters*, 431 U.S. at 340, 97 S.Ct. at 1857. The court has thus attempted to evaluate both the plaintiffs' and the defendant's statistics, keeping in mind the various alleged deficiencies pointed out at trial. However, the court's role is somewhat limited as the trier of fact. If this case were, for example, a medical malpractice lawsuit in which each party presented testimony of an expert witness on the plaintiff's medical condition, and the expert testimony was conflicting, it would be inappropriate for the court to independently examine the plaintiff and then diagnose his medical condition. The court is not qualified to undertake such a task. Nor is the court empowered to do so. *See Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986) ("The trial judge may not ... undertake an independent mission of finding facts 'outside the record of a bench trial over which he [presides].'").

Instead, the court must review the various statistical exhibits and testimony to determine which parts (if any) of the conflicting testimony are the more credible. In other words, the court must work with the evidence already in the record. It is also important to remember that a court is

not an expert statistician, or in the context of a medical malpractice case, a physician. Nevertheless, the court must make findings of fact from the evidence.

In making those findings and evaluating the statistical evidence in this case, the court came to the inevitable conclusion that Westinghouse's statistics were to some extent "fashioned to obtain a desired conclusion." *Equal Employment Opportunity Commission v. Datapoint Corp.*, 570 F.2d 1264, 1269 (5th Cir.1978). Furthermore, the court seriously questions the academic honesty of Dr. Siskin, in part because he testified one way at trial knowing that his own computer data—later filed under court order—showed otherwise. *See* finding of fact number 39.

> Inaccuracies or variations in data or in the formulae used to test such data may easily lead to different, contradictory, or even misleading conclusions by experts. This fact prompted one court to comment that too often statistical conclusions "appear to depend in large part on the side producing them...." And the sophisticated way in which supporting data may be used in developing statistical models in discrimination cases has lead [sic] another Court to caution about "the manipulability of statistics in inquiries of [that] sort," and still another to suggest that Title VII cases too often develop into "contests between college professor statisticians who revel in discoursing about advanced statistical theory" and propounding increasingly complex statistical models.

*Equal Employment Opportunity Commission v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 645 (4th Cir.1983) (citations omitted).

Westinghouse has also attempted to defend its position by presenting allegedly legitimate nondiscriminatory reasons for the different treatment in assigning blacks and whites to their initial positions. *See Griffin*, 755 F.2d at 1526. Westinghouse claims that whites were initially assigned to higher labor grades than blacks because whites possessed a greater number of

"edge factors." Examples of edge factors are industrial experience or additional education. This explanation is probably enough to rebut the prima facie case, since that burden of production is "exceedingly light." *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir.1983).

The plaintiffs' exhibits B and C establish that these alleged edge factors were not present in a number of situations where white employees were assigned to higher labor grades than blacks. Finding of fact number 34. Moreover, it is clear that the alleged edge factors were not necessary or even helpful for the positions. Finding of fact number 35. These facts, in addition to the direct evidence of discrimination, anecdotal testimony, and the subjective nature of the decision-making process at Westinghouse, show that the edge-factor explanation is merely a pretext for discrimination.

In this court's judgment, the plaintiff class has shown that racial discrimination in initial job assignments was Westinghouse's standard procedure and regular practice. *See Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855. They have thus proved the ultimate question—that Westinghouse intentionally discriminated against them. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

*B. Promotions within Hourly Unit— Disparate Treatment Theory*

Title VII provides: "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system, ... provided that such differences are not the result of an intention to discriminate because of race...." 42 U.S.C.A. § 2000e–2(h) (West 1981). Westinghouse contends that the seniority system set forth in the collective bargaining agreements is a bona fide seniority system and, accordingly, a complete defense to the plaintiffs' claim of discrimination in upgrading within the hourly bar-

gaining unit. Defendant's proposed findings of fact and conclusions of law at p. 129, ¶¶ 75–76.

The Supreme Court has held that although Title VII does not define the term "seniority system," such a system can be identified by its principal feature—the dispensing of preferential treatment on the basis of some measure of time served in employment. *California Brewers Association v. Bryant*, 444 U.S. 598, 605–06, 100 S.Ct. 814, 819, 63 L.Ed.2d 55 (1980). The collective bargaining agreements in the present case clearly provide in Article XX that the employees' length of employment will govern promotions or upgrading within the hourly bargaining unit. Westinghouse's system is therefore a seniority system within the meaning of Title VII.

To be an effective defense to the plaintiffs' claims, the seniority system must be bona fide. In *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 352 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), the former Fifth Circuit listed some factors that a court should consider in deciding whether a system is bona fide. Those factors are:

1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;

2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

3) whether the seniority system had its genesis in racial discrimination; and

4) whether the system was negotiated and has been maintained free from any illegal purpose.

*Id.* The plaintiffs have apparently conceded that Westinghouse's seniority system did not have its genesis in racial discrimination and was negotiated free from an illegal purpose. Finding of fact number 82. It is not crystal clear, but it appears that the plaintiffs contend that the system has been maintained with a discriminatory purpose, and thus the existence of the sys-

tem is not a defense in this case. (The court's task is made more difficult because the plaintiffs' proposed findings of fact and conclusions of law do not address at all the question of the effect of the seniority system.)

■ The plaintiffs claim that the discrimination took the form of administration of the General Aptitude Test Battery, the prevacancy bidding process, and the broad discretion accorded the supervisor in whose section the vacancy occurred as to whether the most senior employee who had submitted a bid was qualified for the job in question. Plaintiffs' proposed findings of fact and conclusions of law at p. 23. In reviewing the plaintiffs' contention that the system is maintained with a discriminatory purpose, it should be kept in mind that the fact that the effect of a seniority system is to perpetuate discrimination is insufficient, standing alone, to cause a system to be non-bona fide. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 75–76, 102 S.Ct. 1534, 1540–41, 71 L.Ed.2d 748 (1982). Instead, any differences in treatment of blacks and whites must be *a result of an intent to discriminate* because of race. *Teamsters,* 431 U.S. at 353, 97 S.Ct. at 1863–64; *United States v. Georgia Power Co.,* 695 F.2d 890, 892 (5th Cir.1983) (Unit B). As the Supreme Court explained in 1982:

> Seniority provisions are of "overriding importance" in collective bargaining and they "are universally included in these contracts." The collective-bargaining process "lies at the core of our national labor policy...." Congress was well aware in 1964 that the overall purpose of Title VII, to eliminate discrimination in employment, inevitably would, on occasion, conflict with the policy favoring minimal supervision by courts and other governmental agencies over the substantive terms of collective-bargaining agreements. Section 703(h) represents the balance Congress struck between the two policies, and it is not this Court's function to upset that balance.

*American Tobacco Co.,* 456 U.S. at 76–77, 102 S.Ct. at 1541 (citations and footnote omitted).

Applying these principles to the present case, the question before the court is whether the differences (if any) in the treatment of whites and blacks under Westinghouse's seniority system are caused by Westinghouse's intent to discriminate because of race. A finding of discriminatory intent or the lack of such intent is a finding of fact subject to the clearly erroneous standard of review. *Pullman-Standard v. Swint,* 456 U.S. 273, 289, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982). "Discriminatory intent here [under section 703(h) ] means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive." *Id.* at 289–90, 102 S.Ct. at 1791. However, in making that factual showing, the parties may rely on circumstantial evidence. *See id.* at 289, 102 S.Ct. at 1790.

Thus, "discriminatory impact is ... part of the evidence to be considered by the trial court in reaching a finding on whether there was such a discriminatory intent as a factual matter." *Id.* However, a discriminatory effect alone is not enough to show that a seniority system is not bona fide. *Georgia Power Co.,* 695 F.2d at 892.

■ In the present case, the plaintiffs rely on their statistical evidence, anecdotal testimony, the discretionary nature of the supervisor's decision as to whether an employee is qualified, and the use of the GATB test scores. Plaintiffs' proposed findings of fact and conclusions of law at p. 23. The statistical evidence, even if totally accepted, shows nothing more than a differential impact on blacks. *See* Affidavit of Shapiro at plaintiffs' exhibits A–16 through A–19. Therefore, the statistical evidence alone is insufficient to show discriminatory intent.

■ The plaintiffs also presented a substantial amount of anecdotal testimony concerning upgrading and promotions. However, that testimony also concerned the *effects* of the seniority system. The black

employees testified generally that they had seniority and submitted bids, but did not receive the promotion or upgrading that they sought. *See* findings of fact numbers 111–195. Again, this evidence is evidence of discriminatory impact, and only circumstantial evidence of discriminatory intent. Accordingly, in this court's judgment, the seniority system is bona fide and is thus a bar to plaintiffs' claim of discrimination in upgrading within the hourly unit.

 The determination that the plaintiffs' claim of discriminatory upgrading or denial of promotions within the hourly bargaining unit is barred by the seniority system defense, does not preclude the awarding of seniority to the victims of discrimination in initial job assignments. *See Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1192 (5th Cir.1978). Plant seniority may not antedate July 2, 1965— the effective date of Title VII. *Id.* at 1191. Furthermore, each individual employee or former employee need not prove that the discriminatory practice had an impact on him. *Local 28 of the Sheet Metal Workers' International Association v. Equal Employment Opportunity Commission*, —— U.S. ——, ——, 106 S.Ct. 3019, 3034–35, 92 L.Ed.2d 344 (1986).

## C. Promotions from Hourly to Salaried—Disparate Treatment Theory

The plaintiffs can establish a prima facie case of discrimination in promoting employees from the hourly to the salaried unit by establishing "by a preponderance of the evidence 'that racial discrimination was the company's standard operating procedure— the regular rather than the usual practice.'" *Cooper*, 467 U.S. at 876, 104 S.Ct. at 2800 (quoting *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). This is the same analysis that applies to the plaintiffs' initial assignment claim. The complete analysis was discussed above and need not be repeated here.

 In this court's best judgment, plaintiffs' statistical evidence is not sufficiently compelling standing alone to establish the prima facie case. First, the statistics show only part of the picture—persons hired in the years 1970 through 1972 and initially assigned to labor grades four, five, or six. A similar comparison should have been done for persons hired in all the years at issue. *See generally* D. Baldus & J. Cole, *Statistical Proof of Discrimination* § 9.12 (Supp.1985) (discussing the problem of a small sample). Second, plaintiffs' exhibits show only percentages rather than the actual number of persons. Dr. Shapiro agreed that the "n" value (the number of persons) should have been shown. Trial transcript at vol. I, pp. 75–76. The court thus cannot tell how many persons were promoted to a higher labor grade. Finally, Dr. Shapiro failed to test his figures for statistical significance. In determining whether statistical evidence is enough standing alone to establish a prima facie case, some courts have held that straight percentage comparisons are sufficient when protected groups are blatantly underrepresented. B. Schlei & P. Grossman, *supra* p. 52, at 265 & n. 182; D. Baldus & J. Cole, *supra* p. 65, at § 9.02A. However, in most cases a standard deviation analysis is required. B. Schlei & P. Grossman, *supra* p. 52, at 265 & n. 183.

 Westinghouse also criticized plaintiffs' statistical evidence because plaintiffs' exhibits A–5 through A–8 do not reflect the self-selection aspect of the promotional system. Defendant's proposed findings of fact and conclusions of law at p. 68. It argued that the pool would more accurately have been defined as the employees who were interested in a promotion to the salaried unit, for example, those who had submitted bids. Therefore, according to Westinghouse, the plaintiffs' statistics should have been refined to exclude the employees who were not interested in a transfer to the salaried bargaining unit. The problem with Westinghouse's argument is that that information is unavailable because of Westinghouse's own actions. All bids were apparently destroyed by Westinghouse. Trial transcript at vol. II, pp. 4–5. The court cannot accept this criticism of the statistics

when the underlying problem (lack of information) is caused by Westinghouse.

Even though plaintiffs' statistical evidence alone does not establish a prima facie case of discrimination, the statistical evidence in conjunction with plaintiffs' other evidence may be enough. For example, the Eighth Circuit held in 1981 that the plaintiff class had established a prima facie case of discrimination even though their statistics alone did not establish a prima facie case. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1135 (8th Cir.1981). The court held that other evidence (the defendant's prior history of discrimination, the subjective decisionmaking, the existence of an all-white supervisory force, and the defendant's failure to support its affirmative action program) in combination with the statistics supported the finding of discrimination. *Id.* at 1135 and n. 14. In the present case, plaintiffs' other evidence consists of anecdotal testimony and evidence concerning the subjective nature of the decision-making process.

Plaintiffs presented the testimony of eight employees: (1) Goss, who testified that he bid on two salaried positions (dispatcher and quality control) but white employees received both promotions; (2) Ellison, who testified that he bid unsuccessfully for positions in quality control, traffic control, the salvage department as an accounting clerk, and as an inspector; (3) James, who testified that he bid on several salaried-unit jobs, including production dispatcher and inspector, but whites with less seniority received most of those promotions; (4) Stevens, who testified that he submitted a bid to his supervisor for an inspector's position but his supervisor threw the bid into the trash can because Stevens was a good employee and the supervisor did not want to lose him; (5) Stephens, who testified that he bid for an inspector's position but was told that he was disqualified because he did not have a high school diploma; (6) Calloway, who testified that he was interested in quality control and dispatcher positions but was disqualified because of his test scores; (7) Butler, who testified that he unsuccessfully

bid for a job in quality control and for a dispatcher's position; and (8) Fortson, who testified that he bid for an electronic tester position and for an inspector's position, but white employees filled all the openings.

The plaintiffs contend that they presented testimony of eleven persons who had been passed over for promotion to salaried positions "such as dispatcher, quality control, and supervisor." Plaintiffs' proposed findings of fact and conclusions of law at p. 27. The plaintiffs' evidence to support their claim of discrimination in promotions from the hourly unit to non-supervisory positions in the salaried unit versus promotions to supervisory positions is different. Moreover, there are two different selection procedures—one for promotions to non-supervisory salaried positions and one for promotions to supervisory positions. Therefore, these claims should be considered separately.

The court has had some difficulty analyzing the anecdotal testimony on promotions. Almost all the witnesses testified simply that they had asked for a promotion to a particular position (for example, dispatcher) but did not receive it. It is impossible to determine from this testimony alone whether the witness was interested in a promotion within the hourly unit or in a promotion from the hourly unit to the salaried unit. The testimony would have been much more understandable (and thus more helpful) if plaintiffs' counsel had established those facts in the record. To determine whether a witness testified about an hourly or a salaried unit position, the court has looked up the position in defendant's exhibit 4—which lists all hourly jobs—to determine whether the position is hourly. If a position is not included in defendant's exhibit 4, the court considered it a salaried-unit position. The court also asked Westinghouse to submit post-trial a list of positions in the salaried unit. In any event, plaintiffs' counsel could have made their case clearer if they had made that distinction.

Westinghouse notes that the anecdotal testimony consists in general of statements by the witnesses that "I bid at some time and did not receive the job." Defendant's proposed findings of fact and conclusions of law at p. 74, ¶ 202. Otherwise stated, the witnesses testified only to the effects of the defendant's practices and did not testify as to discriminatory intent. *Cf.* finding of fact number 133 (testimony of Byrd that he was not allowed to participate in the training program because he is black). The plaintiffs are not required—or even expected —to produce anecdotal testimony of racial animus in decisionmaking. *See Bell,* 715 F.2d at 1556 ("[D]irect evidence of discriminatory intent will most likely be nonexistent or difficult to prove."). However, when such evidence is present (as in the plaintiffs' case concerning discrimination in initial assignment), the plaintiffs have a stronger case. Nevertheless, the testimony here does bring Dr. Shapiro's statistics "convincingly to life." *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856.

▉ The most significant evidence presented by the plaintiffs is the evidence concerning the subjective nature of the decisionmaking process. The decision of who would be promoted to a particular opening in the salaried unit was left virtually exclusively up to the white supervisor in the area where the vacancy occurred. For part of the years in question, the supervisor in turn relied on "confidential rating sheets" completed by the applicant's immediate foreman who was also white. The decision was thus entirely subjective because it was based entirely on the supervisor's "impression" of the candidate. The defendant failed to introduce any evidence to show any semblance of objectivity in the decision. Considering Dr. Shapiro's statistics and the anecdotal testimony, defendant's subjective process is, in this court's judgment, suspicious. The process appears to be extremely susceptible of abuse. *See Cooper v. University of Texas at Dallas,* 482 F.Supp. 187, 194 (N.D.Tex.1979), *aff'd,* 648 F.2d 1039 (5th Cir.1981) (Unit A). The plaintiffs' have produced evidence of differ-

ential treatment of blacks and whites as to promotions to the salaried unit. Considering all the evidence as a whole, the inescapable conclusion is that Westinghouse's supervisors used the subjective procedure as a "front" to discriminate against blacks. *See Griffin,* 755 F.2d at 1525; *Rowe,* 457 F.2d at 359. Therefore, the plaintiffs have established a prima facie case of discrimination in promoting employees from the hourly unit to the salaried unit.

Westinghouse has not raised a valid defense to the prima facie case. Its main defense is that Dr. Shapiro's statistics are misleading. Those criticisms were addressed by the court earlier in the discussion of whether the statistics were sufficient standing alone to create a prima facie case. *See supra* pp. 692–93. Although Westinghouse's criticisms do have some theoretical merit, they are insufficient to "raise a genuine issue of fact as to whether it discriminated." *Griffin,* 755 F.2d at 1525–26. Accordingly, the plaintiff class has shown that racial discrimination in promotions from the hourly unit to the salaried unit was Westinghouse's standard procedure and regular practice and they have proved the "ultimate question"—that Westinghouse intentionally discriminated against them. Finding of fact number 100.

### D. Promotions to Supervisor—Disparate Treatment Theory

The plaintiffs also contend that Westinghouse discriminated against blacks in the selection of supervisors. In general, supervisors were selected by the manager of the area in which the vacancy occurred. One factor taken into consideration is the employee's performance while serving as acting supervisor. The plaintiffs further maintain that blacks are not asked to fill in as acting supervisors because of their race.

▉ The plaintiffs evidence consists primarily of Westinghouse's EEO-1 reports. These reports show that there were *no black managers or supervisors until 1972.* In 1972, two blacks (Joseph Hester and Conolus Scott) were selected to be supervi-

sors. Plaintiffs' evidence shows that the decision of who would be selected as supervisor was totally subjective and that all the decision-makers were white. The plaintiffs also presented anecdotal testimony by Mr. Ellison, Mr. Stevens, Mr. Stephens, and Mr. Culbreath.

Plaintiffs' evidence establishes a prima facie case of discrimination. *See Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855. The court has placed a good deal of emphasis on the total lack of black supervisors and managers until 1972. The Fifth Circuit had occasion to review an "inexorable zero" case in *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647 (5th Cir.1983). Their discussion of such cases is particularly relevant here.

> We cannot escape the fact that during these seven and one-half years, there were hundreds of male manager trainees chosen and not a single woman. The hiring record demonstrates not just disparities in hiring, but *total exclusion* of women from the entry level management position. We differ with the defendant's suggestion that "zero is just a number." To the noble theoretician predicting the collisions of weightless elephants on frictionless roller skates, zero may be just another integer, but to us it carries special significance in discerning firm policies and attitudes. Evidence of two or three acts of hiring women as manager trainees during this period might not have affected the statistical significance of the tests performed by the experts, but it would indicate at least some willingness to consider women as equals in firm management. Perhaps for this reason, the courts have been particularly dubious of attempts by employers to explain away "the inexorable zero" when the hiring columns are totalled. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396, 419 n. 23 (1977), *vacating United States v. T.I.M.E.–D.C., Inc.*, 517 F.2d 299, 315 (5th Cir.1975); *Wilkins v. University of Houston*, 654 F.2d 388, 410 (5th Cir.

1981), *cert. denied*, 459 U.S. 822, 103 S.Ct. 51, 74 L.Ed.2d 57 (1982).

*Id.* at 662.

Westinghouse claims that the EEO–1 reports are misleading because they do not take into account labor grade and seniority, which have an impact on the selection of supervisors. Westinghouse thus argues that a correct statistical analysis should adjust for these factors. Defendant's proposed findings of fact and conclusions of law at p. 135, ¶ 92. This argument is without merit. The former Fifth Circuit has held:

> Mindful of *Hazelwood [School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)], we nevertheless find the plaintiff's statistics adequate to establish a prima facie case. First, a prima facie case may be shown without evidence of qualifications where the inference of discrimination is supported by a compelling level of racial underrepresentation in a sizeable work force. In *[U.S. v.] Hayes International Corp.*, [456 F.2d 112 (5th Cir.1972),] we noted that when substantial underrepresentation is shown as compared with general population figures, the burden of proving lack of qualifications is on the Company. Moreover, the usefulness of statistics of this nature "varies with the surrounding facts and circumstances, which either support or undermine the inference of discrimination offered by the statistics." The Company's entry level hiring policy is a distinctive circumstance in this case supporting the inference of discrimination. When a company adopts a policy and practice of hiring in at low level unskilled jobs and promoting to upper-level positions based upon training received and skills developed at the plant itself, it cannot convincingly challenge the prima facie showing under the *Hazelwood* "qualifications" dicta.

*Fisher v. Proctor & Gamble Manufacturing Co.*, 613 F.2d 527, 544 (5th Cir.1980) (citations omitted). Likewise, in this case Westinghouse cannot successfully argue that the plaintiffs' statistics are misleading

because they do not exclude the employees who lack a high labor grade or long-time seniority. Westinghouse discriminated against black employees in all phases of their job assignments, beginning with initial labor grade assignment. Thus, if black employees do have lower labor grades than whites, that disparity is caused by Westinghouse's discrimination. It would be unfair to now allow Westinghouse to avoid liability for discrimination in the selection of supervisors on the ground that black employees do not have sufficiently high labor grades when the lower grades are caused by Westinghouse's discrimination.

### E. Use of Test Scores—Disparate Impact Theory

The landmark case on the use of test scores that adversely impact upon blacks is *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Supreme Court held that "[t]he Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853. The Court also held in *Griggs* that proof of discriminatory intent is not required. *Id.* at 432, 91 S.Ct. at 854.

Four years later, the Court established the framework for analyzing disparate impact claims. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The plaintiffs can establish a prima facie case of discrimination by showing that "the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Id.* at 425, 95 S.Ct. at 2375. The employer then has the burden of proving that the test is job-related. *Id.* If the employer meets that burden, the plaintiffs can show that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Id. See also Kilgo v. Bowman Transpor-*

*tation, Inc.*, 789 F.2d 859, 867–68 (11th Cir.1986); *Maddox v. Claytor*, 764 F.2d 1539, 1548 (11th Cir.1985); *Walker v. Jefferson County Home*, 726 F.2d 1554, 1557–59 (11th Cir.1984).

■ The facially neutral employment practices, challenged here are the administration of the GATB and the subjective decision-making process. The test score was one factor relied upon in deciding initial job assignment and promotions. There is a conflict of authority among the circuits as to whether the disparate impact theory applies to subjective decision-making policies. B. Schlei & P. Grossman, *supra* p. 52, at 255. In the Eleventh Circuit, the disparate impact theory may be used. *Griffin v. Carlin*, 755 F.2d 1516, 1522–25 (11th Cir.1985).

The plaintiff class has clearly established a prima facie case. Their statistical evidence shows that black applicants score lower than white applicants on three of the four tests. Westinghouse presented no evidence to contradict the plaintiffs' statistics. The plaintiffs further showed that the scores were relied upon as a factor in the decision-making process to determine initial job assignment and promotions.

The burden then shifts to Westinghouse to prove that the test is job-related. Westinghouse has not even argued that the test is job-related. Indeed, it voluntarily ceased requiring applicants to take the test in mid–1972 after a study showed there was no correlation between test scores and job performance.

Because Westinghouse has not rebutted the plaintiffs' prima facie case, the plaintiffs are entitled to prevail under the disparate impact theory.

### F. Individual Claims

In addition to the class claims, the named plaintiffs and intervenors have asserted individual claims of discrimination. In evaluating the individual claims, the court must take into consideration its finding of a pattern or practice of racial discrimination against the class. *Griffin*, 755 F.2d at

1529. The Eleventh Circuit set forth the proper burden of proof in *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir.1986):

> In a pattern and practice case, if the plaintiff can establish "that [sex] discrimination was the company's standard operating procedure," *see Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855, the burden shifts to the employer to *prove* that the plaintiff was not, in fact, the victim of discrimination. *Id.* at 359, 97 S.Ct. at 1866. *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976). In other words, once a pattern and practice of discrimination is established, a rebuttable presumption that plaintiff was discriminated against because of her sex and is entitled to recovery obtains. The employer may overcome this presumption only with clear and convincing evidence that job decisions made when the discriminatory policy was in force were not made in pursuit of that policy. *See Teamsters*, 431 U.S. at 362, 97 S.Ct. at 1868.

Because the plaintiff class established that Westinghouse had a pattern and practice of discriminating against blacks, there is a rebuttable presumption that the named plaintiffs and intervenors were discriminated against. Therefore, Westinghouse has the burden to prove that these individuals were not victims of discrimination.

Westinghouse claims that it is difficult to defend these claims because of the passage of time since the alleged discriminatory acts occurred. In the court's judgment, any such difficulty is Westinghouse's own fault and does not relieve them of their burden in defending the case. The EEOC charges were filed in 1969. From the date in 1969 when Westinghouse was notified of the pending charges, Westinghouse has been on notice that there was a real possibility that a lawsuit would be filed. Westinghouse should have taken the necessary steps to insure that its evidence would be preserved. The plaintiffs cannot be held

responsible for Westinghouse's failure to do so. The court is especially disturbed by Westinghouse's intentional "purging" of the bids submitted by the employees.

After carefully reviewing the testimony at trial and other evidence on record, it is clear that Westinghouse has not met its burden of proof. Accordingly, named plaintiffs Calloway and Moses and named intervenors Culbreath, Goss, Byrd, and Freeman are entitled to prevail on their individual claims.

### G. Section 1981 Claims

As noted earlier, the plaintiffs brought this action under both Title VII and section 1981. It has been settled since 1975 that "§ 1981 affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). The legal elements of a section 1981 claim are identical to those of a Title VII disparate treatment claim. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985); *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n. 6 (11th Cir.1983). An employer is liable under section 1981 only if the plaintiff proves purposeful discrimination. *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Lincoln*, 697 F.2d at 935 n. 6. Therefore, the court need not repeat the Title VII analysis here. As under Title VII, plaintiffs should prevail under section 1981 on their claims of racial discrimination in initial job assignments, promotions to the salaried unit, and promotions to supervisor. The existence of a bona fide seniority system bars plaintiffs' claim of discrimination in upgrading within the hourly bargaining unit. *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1349 (11th Cir.1983).

### VIII. Conclusion

To summarize, the court has determined that the case may be maintained as a class action; that plaintiffs' discipline and con-

structive discharge claims are dismissed under the "like or related" rule; that plaintiffs' section 1981 claim for monetary damages is time-barred but the section 1981 claim for injunctive and declaratory relief is not time-barred; and that the case should not be dismissed for failure to prosecute. The court also found that the plaintiff class should prevail under the disparate treatment theory on their claims of discrimination in initial job assignments, promotions from the hourly unit to the salaried unit, and promotions to supervisor.[6] The plaintiff class should also prevail under the disparate impact theory. The court further found that the individual claims of discrimination should be resolved in favor of the plaintiffs. The claim of discrimination in upgradings within the hourly bargaining unit is barred by Westinghouse's bona fide seniority system.

Both sides are directed to file, within thirty days, suggestions for the disposition of the damages stage of the case. The parties should set forth their positions as to the method of determining all relief due to the plaintiffs. The parties should keep in mind that the court is fully committed to the principle that the plaintiffs should be "made whole" for the injuries caused by Westinghouse's unlawful discrimination. *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372. The parties should also suggest how the monetary damages should be distributed. Finally, the plaintiffs are directed to propose appropriate provisions for notice to the class. *See Cox*, 784 F.2d at 1554–55; *Penson*, 634 F.2d at 993–94.

---

**6.** The plaintiffs also claim that they were discriminated against with regard to acceptance into skilled trades apprentice programs. Plaintiffs' proposed findings of fact and conclusions of law at 2–3. That claim is part of the plaintiffs' general claim of discrimination in promotions and thus need not be discussed separately.

Addendum 1 to Court's Opinion

EXHIBIT A-1

ALL HOURLY HIRES

LABOR GRADE
INITIAL ASSIGNMENT

| Year | Lab. Gr. | W | B | Total | $X_1^2$ | St'd Dev. | $X_1^2$ Prob. | Fisher Exact | Statist. Signif. |
|------|----------|---|---|-------|---------|-----------|---------------|--------------|------------------|
| 1968 | 1 - 4 | 16 | 13 | 29 | 20.306 | 4.506 | .0000066 | .00001 | * |
| | 5 - 17 | 49 | 2 | 51 | | | | | |
| | Total | 65 | 15 | 80 | | | | | |
| 1969 | 1 - 4 | 63 | 67 | 130 | 58.491 | 7.648 | 0 | -- | * |
| | 5 - 17 | 293 | 60 | 353 | | | | | |
| | Total | 356 | 127 | 483 | | | | | |
| 1970 | 1 - 4 | 45 | 48 | 93 | 14.964 | 3.868 | .00011 | -- | * |
| | 5 - 17 | 123 | 47 | 170 | | | | | |
| | Total | 168 | 95 | 263 | | | | | |
| 1971 | 1 - 4 | 39 | 72 | 111 | 17.488 | 4.182 | .000029 | -- | * |
| | 5 - 17 | 60 | 33 | 93 | | | | | |
| | Total | 99 | 105 | 204 | | | | | |
| 1972 | 1 - 4 | 141 | 168 | 309 | 41.904 | 6.473 | .1x10-10 | | * |
| | 5 - 17 | 171 | 62 | 233 | | | | | |
| | Total | 312 | 230 | 542 | | | | | |
| 1973 | 1 - 4 | 134 | 90 | 224 | 5.434 | 2.331 | .01975 | -- | * |
| | 5 - 17 | 89 | 34 | 123 | | | | | |
| | Total | 223 | 124 | 347 | | | | | |
| 1974 | 1 - 4 | 62 | 47 | 109 | 3.663 | 1.914 | .0556 | -- | |
| | 5 - 17 | 71 | 31 | 102 | | | | | |
| | Total | 133 | 78 | 211 | | | | | |
| 1975 | 1 - 4 | 0 | 0 | 0 | - | - | - | -- | |
| | 5 - 17 | 1 | 0 | 1 | | | | | |
| | Total | 1 | 0 | 1 | | | | | |
| 1976 | 1 - 4 | 4 | 0 | 4 | - | - | - | -- | |
| | 5 - 17 | 2 | 0 | 2 | | | | | |
| | Total | 6 | 0 | 6 | | | | | |
| 1977 | 1 - 4 | 15 | 3 | 18 | 0.000 | 0.000 | 1.00000 | 1.0000 | |
| | 5 - 17 | 55 | 11 | 66 | | | | | |
| | Total | 70 | 14 | 84 | | | | | |
| 1978 | 1 - 4 | 0 | 0 | 0 | - | - | - | -- | |
| | 5 - 17 | 0 | 0 | 0 | | | | | |
| | Total | 0 | 0 | 0 | | | | | |
| 1979 | 1 - 4 | 0 | 0 | 0 | - | - | - | -- | |
| | 5 - 17 | 1 | 0 | 1 | | | | | |
| | Total | 1 | 0 | 1 | | | | | |
| 1980 | 1 - 4 | 0 | 0 | 0 | - | - | - | -- | |
| | 5 - 17 | 0 | 0 | 0 | | | | | |
| | Total | 0 | 0 | 0 | | | | | |

EXHIBIT A-2

OCCUPATIONAL GROUP
INITIAL ASSIGNMENT

| Year | Occ. ~~Lab.~~ Gr. | W | B | Total | $X_1{}^2$ | St'd Dev. | $X_1{}^2$ Prob. | Fisher Exact | Statist. Signif. |
|------|------|------|------|------|------|------|------|------|------|
| 1968 | =1 | 2 | 10 | 12 | 38.653 | 6.217 | $.5 \times 10^{-9}$ | < .00001 | * |
| | ≠1 | 63 | 5 | 68 | | | | | |
| | Total | 65 | 15 | 80 | | | | | |
| 1969 | =1 | 11 | 27 | 38 | 42.942 | 6.553 | $.1 \times 10^{-9}$ | < .00001 | * |
| | ≠1 | 344 | 99 | 443 | | | | | |
| | Total | 355 | 126 | 481 | | | | | |
| 1970 | =1 | 2 | 22 | 24 | 35.313 | 5.942 | $.3 \times 10^{-8}$ | < .00001 | * |
| | ≠1 | 166 | 73 | 239 | | | | | |
| | Total | 168 | 95 | 263 | | | | | |
| 1971 | =1 | 10 | 25 | 35 | 6.737 | 2.596 | .00943 | .01487 | * |
| | ≠1 | 89 | 80 | 169 | | | | | |
| | Total | 99 | 105 | 204 | | | | | |
| 1972 | =1 | 10 | 40 | 50 | 31.818 | 5.641 | $.2 \times 10^{-7}$ | -- | * |
| | ≠1 | 302 | 190 | 492 | | | | | |
| | Total | 312 | 230 | 542 | | | | | |
| 1973 | =1 | 22 | 40 | 62 | 27.229 | 5.218 | $.2 \times 10^{-6}$ | -- | * |
| | ≠1 | 201 | 84 | 285 | | | | | |
| | Total | 223 | 124 | 347 | | | | | |
| 1974 | =1 | 26 | 19 | 45 | 0.678 | 0.823 | .4105 | -- | |
| | ≠1 | 107 | 59 | 166 | | | | | |
| | Total | 133 | 78 | 211 | | | | | |
| 1975 | =1 | 0 | 0 | 0 | - | - | - | - | |
| | ≠1 | 1 | 0 | 1 | | | | | |
| | Total | 1 | 0 | 1 | | | | | |
| 1976 | =1 | 0 | 0 | 0 | - | - | - | - | |
| | ≠1 | 6 | 0 | 6 | | | | | |
| | Total | 6 | 0 | 6 | | | | | |
| 1977 | =1 | 8 | 1 | 9 | 0.224 | 0.473 | .6362 | 1.00000 | |
| | ≠1 | 62 | 13 | 75 | | | | | |
| | Total | 70 | 14 | 84 | | | | | |
| 1978 | =1 | 0 | 0 | 0 | - | - | - | - | |
| | ≠1 | 0 | 0 | 0 | | | | | |
| | Total | 0 | 0 | 0 | | | | | |
| 1979 | =1 | 0 | 0 | 0 | - | - | - | - | |
| | ≠1 | 1 | 0 | 1 | | | | | |
| | Total | 1 | 0 | 1 | | | | | |
| 1980 | =1 | 0 | 0 | 0 | - | - | - | - | |
| | ≠1 | 0 | 0 | 0 | | | | | |
| | Total | 0 | 0 | 0 | | | | | |

EXHIBIT A-3

ALL HOURLY EMPLOYEES
LAST LABOR GRADE IN CALENDER YEAR
WORK FORCE PROFILE

| Year | Lab. Gr. | W | B | Total | $X_1^2$ | St'd Dev. $X_1^2$ | Prob. | Fisher Exact | Statist. Signif. |
|------|----------|---|---|-------|---------|-------------------|-------|--------------|------------------|
| 1968 | 1 – 4 | ~~47~~ 68 | ~~55~~ 69 | ~~102~~ 137 | ~~93.150~~ | ~~9.651~~ | 0 | -- | * |
| | 5 – 17 | ~~337~~ 545 | ~~41~~ 78 | ~~378~~ 623 | 103.100 | 10.154 | | | |
| | Total | ~~384~~ 613 | ~~96~~ 147 | ~~480~~ 760 | | | | | |
| 1969 | 1 – 4 | 66 | 70 | 136 | 69.231 | 8.321 | 0 | -- | * |
| | 5 – 17 | 564 | 126 | 690 | | | | | |
| | Total | 630 | 196 | 826 | | | | | |
| 1970 | 1 – 4 | 76 | 81 | 157 | 45.907 | 6.775 | $.1 \times 10^{-12}$ | -- | * |
| | 5 – 17 | 547 | 177 | 724 | | | | | |
| | Total | 623 | 258 | 881 | | | | | |
| 1971 | 1 – 4 | 86 | 107 | 193 | 45.620 | 6.754 | $.1 \times 10^{-12}$ | -- | * |
| | 5 – 17 | 508 | 211 | 719 | | | | | |
| | Total | 594 | 318 | 912 | | | | | |
| 1972 | 1 – 4 | 134 | 167 | 301 | 68.377 | 8.269 | 0 | -- | * |
| | 5 – 17 | 667 | 276 | 943 | | | | | |
| | Total | 801 | 443 | 1244 | | | | | |
| 1973 | 1 – 4 | 177 | 176 | 353 | 44.369 | 6.661 | $.3 \times 10^{-12}$ | -- | * |
| | 5 – 17 | 730 | 317 | 1047 | | | | | |
| | Total | 907 | 493 | 1400 | | | | | |
| 1974 | 1 – 4 | 150 | 140 | 290 | 21.506 | 4.637 | .0000035 | -- | * |
| | 5 – 17 | 761 | 385 | 1146 | | | | | |
| | Total | 911 | 525 | 1436 | | | | | |
| 1975 | 1 – 4 | 130 | 149 | 279 | 37.793 | 6.148 | $.8 \times 10^{-9}$ | -- | * |
| | 5 – 17 | 647 | 321 | 968 | | | | | |
| | Total | 777 | 470 | 1247 | | | | | |
| 1976 | 1 – 4 | 72 | 70 | 142 | 9.437 | 3.072 | .00213 | -- | * |
| | 5 – 17 | 571 | 319 | 890 | | | | | |
| | Total | 643 | 389 | 1032 | | | | | |
| 1977 | 1 – 4 | 78 | 59 | 137 | 3.035 | 1.742 | .0815 | -- | * |
| | 5 – 17 | 613 | 336 | 949 | | | | | |
| | Total | 691 | 395 | 1086 | | | | | |
| 1978 | 1 – 4 | 68 | 57 | 125 | 4.719 | 2.172 | .02986 | -- | * |
| | 5 – 17 | 593 | 328 | 921 | | | | | |
| | Total | 661 | 385 | 1046 | | | | | |
| 1979 | 1 – 4 | 67 | 67 | 134 | 11.565 | 3.401 | .00067 | -- | * |
| | 5 – 17 | 595 | 318 | 913 | | | | | |
| | Total | 662 | 385 | 1047 | | | | | |
| 1980 | 1 – 4 | ~~52~~ 53 | ~~55~~ 59 | ~~107~~ 112 | ~~7.523~~ | ~~2.743~~ | ~~.00609~~ | -- | * |
| | 5 – 17 | ~~480~~ 509 | ~~294~~ 307 | ~~782~~ 816 | 9.3467 | 3.057 | .003 | | |
| | Total | ~~540~~ 562 | ~~349~~ 366 | ~~889~~ 928 | | | | | |

# 703

## EXHIBIT A-4

ALL HOURLY EMPLOYEES
LAST LABOR GRADE IN CALENDER YEAR
**WORK FORCE PROFILE**

| Year | Lab. Gr. | W | B | Total | $X_1^2$ | St'd Dev. | $X_1^2$ Prob. | Fisher Exact | Statist. Signif. |
|------|----------|---|---|-------|---------|-----------|---------------|--------------|------------------|
| 1968 | 1 - 7 | ~~311~~ 459 | ~~95~~ 140 | ~~406~~ 599 | ~~19.016~~ 19.438 | ~~4.361~~ 5.426 | ~~.000013~~ .1x10⁻⁶ | ~~<.00001~~ -- | * |
| | 8 - 17 | ~~73~~ 154 | ~~17~~ 7 | ~~74~~ 161 | | | | | |
| | Total | ~~384~~ 613 | ~~96~~ 147 | ~~480~~ 760 | | | | | |
| 1969 | 1 - 7 | 478 | 185 | 663 | 32.353 | 5.688 | .1x10⁻⁷ | -- | * |
| | 8 - 17 | 152 | 11 | 163 | | | | | |
| | Total | 630 | 196 | 826 | | | | | |
| 1970 | 1 - 7 | 435 | 234 | 669 | 43.505 | 6.596 | .4x10⁻¹² | -- | * |
| | 8 - 17 | 188 | 24 | 212 | | | | | |
| | Total | 623 | 258 | 881 | | | | | |
| 1971 | 1 - 7 | 404 | 291 | 695 | 63.059 | 7.941 | 0 | -- | * |
| | 8 - 17 | 190 | 27 | 217 | | | | | |
| | Total | 594 | 318 | 912 | | | | | |
| 1972 | 1 - 7 | 554 | 397 | 951 | 66.269 | 8.141 | 0 | -- | * |
| | 8 - 17 | 247 | 46 | 293 | | | | | |
| | Total | 801 | 443 | 1244 | | | | | |
| 1973 | 1 - 7 | 633 | 439 | 1072 | 66.016 | 8.125 | 0 | -- | * |
| | 8 - 17 | 274 | 54 | 328 | | | | | |
| | Total | 907 | 493 | 1400 | | | | | |
| 1974 | 1 - 7 | 592 | 457 | 1049 | 82.360 | 9.075 | 0 | -- | * |
| | 8 - 17 | 319 | 68 | 387 | | | | | |
| | Total | 911 | 525 | 1436 | | | | | |
| 1975 | 1 - 7 | 503 | 423 | 926 | 97.784 | 9.889 | 0 | -- | * |
| | 8 - 17 | 274 | 47 | 321 | | | | | |
| | Total | 777 | 470 | 1247 | | | | | |
| 1976 | 1 - 7 | 383 | 329 | 712 | 70.873 | 8.419 | 0 | -- | * |
| | 8 - 17 | 260 | 60 | 320 | | | | | |
| | Total | 643 | 389 | 1032 | | | | | |
| 1977 | 1 - 7 | 414 | 320 | 734 | 51.075 | 7.147 | 0 | -- | * |
| | 8 - 17 | 277 | 75 | 352 | | | | | |
| | Total | 691 | 395 | 1086 | | | | | |
| 1978 | 1 - 7 | 386 | 312 | 698 | 56.184 | 7.496 | 0 | -- | * |
| | 8 - 17 | 275 | 73 | 348 | | | | | |
| | Total | 661 | 385 | 1046 | | | | | |
| 1979 | 1 - 7 | 385 | 315 | 700 | 61.505 | 7.842 | 0 | -- | * |
| | 8 - 17 | 277 | 70 | 347 | | | | | |
| | Total | 662 | 385 | 1047 | | | | | |
| 1980 | 1 - 7 | ~~319~~ 337 | ~~285~~ 301 | ~~604~~ 638 | ~~49.658~~ | ~~7.047~~ | ~~.1x10⁻¹³~~ | -- | * |
| | 8 - 17 | ~~221~~ 225 | ~~64~~ 65 | ~~285~~ 290 | 51.194 | 7.155 | 0 | | |
| | Total | ~~540~~ 562 | ~~349~~ 366 | ~~889~~ 928 | | | | | |

Amended Exhibit A-5

ALL 1970 HOURLY HIRES INTO LABOR GRADES 04-06 WHO WERE STILL EMPLOYED DURING SUBSEQUENT YEARS - MEAN LABOR GRADE

| Hire Yr. | Initial Labor Gr | Subsequent Year | W | B | W-B | PERCENTAGE SALARIED AND MANAGEMENT | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | W | B | W-R |
| 1970 | 04 | 1971 | 5.4 | 5.5 | -.1 | 0 | 0 | - |
| | | 1972 | 6.2 | 5.6 | .6 | 0 | 0 | - |
| | | 1973 | 6.1 | 6.3 | -.2 | 0 | 0 | - |
| | | 1974 | 6.2 | 6.3 | -.1 | 0 | 0 | - |
| | | 1975 | 5.9 | 5.7 | .2 | 0 | 0 | - |
| | | 1976 | 6.4 | 6.0 | .4 | 8.3 | 0 | 8.3 |
| | | 1977 | 6.9 | 6.4 | .5 | 0 | 0 | - |
| | | 1978 | 6.9 | 6.4 | .5 | 0 | 0 | - |
| | | 1979 | 6.9 | 6.5 | .4 | 0 | 0 | - |
| | | 1980 | 6.9 | 6.3 | .6 | - | - | - |
| 1970 | 05 | 1971 | 5.5 | 4.9 | .6 | 6.7 | 0 | 6.7 |
| | | 1972 | 6.2 | 6.0 | .2 | 14.3 | 0 | 14.3 |
| | | 1973 | 7.8 | 6.8 | 1.0 | 28.6 | 0 | 28.6 |
| | | 1974 | 7.7 | 6.3 | 1.4 | 14.3 | 0 | 14.3 |
| | | 1975 | 8.3 | 6.3 | 2.0 | 14.3 | 0 | 14.3 |
| | | 1976 | 10.5 | 6.0 | 4.5 | 20.0 | 0 | 20.0 |
| | | 1977 | 11.5 | 6.0 | 5.5 | 20.0 | 0 | 20.0 |
| | | 1978 | 11.5 | 6.0 | 5.5 | 20.0 | 0 | 20.0 |
| | | 1979 | 11.5 | 6.0 | 5.5 | 20.0 | 0 | 20.0 |
| | | 1980 | 11.5 | 6.0 | 5.5 | - | - | - |
| 1970 | 06 | 1971 | 6.2 | 6.1 | .1 | 2.9 | 0 | 2.9 |
| | | 1972 | 6.7 | 6.3 | .4 | 15.4 | 0 | 15.4 |
| | | 1973 | 6.8 | 6.6 | .2 | 16.7 | 0 | 16.7 |
| | | 1974 | 7.8 | 6.9 | .9 | 18.8 | 0 | 18.8 |
| | | 1975 | 6.4 | 6.5 | -.1 | 6.7 | 0 | 6.7 |
| | | 1976 | 6.9 | 6.5 | .4 | 6.7 | 0 | 6.7 |
| | | 1977 | 7.2 | 6.6 | .6 | 14.3 | 0 | 14.3 |
| | | 1978 | 6.9 | 6.7 | .2 | 13.3 | 0 | 13.3 |
| | | 1979 | 7.7 | 6.6 | 1.1 | 6.7 | 0 | 6.7 |
| | | 1980 | 7.0 | 6.6 | .4 | - | - | - |

Amended Exhibit A-6

ALL 1971 HOURLY HIRES INTO LABOR GRADES 04-06 WHO WERE STILL EMPLOYED DURING SUBSEQUENT YEARS

| Hire Yr. | Initial Labor Gr | Subsequent Year | MEAN LABOR GRADE | | | PERCENTAGE SALARIED AND MANAGEMENT | | |
|---|---|---|---|---|---|---|---|---|
| | | | W | B | W-B | W | B | W-B |
| 1971 | 04 | 1972 | 5.5 | 5.0 | .5 | 0 | 0 | - |
| | | 1973 | 5.4 | 5.6 | .2 | 0 | 0 | - |
| | | 1974 | 6.2 | 5.9 | .3 | 8.3 | 0 | 8.3 |
| | | 1975 | 6.4 | 5.7 | .7 | 0 | 0 | - |
| | | 1976 | 6.3 | 5.8 | .5 | 0 | 0 | - |
| | | 1977 | 6.2 | 6.1 | .1 | 0 | 0 | - |
| | | 1978 | 6.2 | 6.2 | 0 | 0 | 0 | - |
| | | 1979 | 6.2 | 6.2 | 0 | 0 | 0 | - |
| | | 1980 | 6.1 | 6.2 | - .1 | - | - | - |
| 1971 | 05 | 1972 | 7.5 | 5.8 | 1.7 | 0 | 0 | - |
| | | 1973 | 8.0 | 6.4 | 1.6 | 0 | 0 | - |
| | | 1974 | 8.7 | 6.7 | 2.0 | 0 | 0 | - |
| | | 1975 | 7.3 | 5.8 | 1.5 | 0 | 0 | - |
| | | 1976 | 7.7 | 6.2 | 1.5 | 0 | 0 | - |
| | | 1977 | 8.3 | 6.4 | 1.9 | 0 | 0 | - |
| | | 1978 | 8.3 | 7.0 | 1.3 | 0 | 0 | - |
| | | 1979 | 9.7 | 6.6 | 3.1 | 0 | 0 | - |
| | | 1980 | 9.7 | 6.6 | 3.1 | - | - | - |
| 1971 | 06 | 1972 | 6.7 | 5.4 | 1.3 | 7.4 | 0 | 7.4 |
| | | 1973 | 7.6 | 5.9 | 1.7 | 14.3 | 0 | 14.3 |
| | | 1974 | 7.6 | 6.9 | .7 | 15.4 | 12.5 | 2.9 |
| | | 1975 | 6.8 | 6.1 | .7 | 0 | 0 | - |
| | | 1976 | 6.9 | 6.2 | .7 | 0 | 0 | - |
| | | 1977 | 7.5 | 6.7 | .8 | 8.3 | 0 | 8.3 |
| | | 1978 | 7.7 | 6.7 | 1.0 | 16.7 | 0 | 16.7 |
| | | 1979 | 8.1 | 6.7 | 1.4 | 8.3 | 0 | 8.3 |
| | | 1980 | 7.4 | 6.7 | .7 | - | - | - |

Amended Exhibit A-7

ALL 1972 HOURLY HIRES
INTO LABOR GRADES 03-06 WHO WERE
STILL EMPLOYED DURING SUBSEQUENT YEARS

| Hire Yr. | Initial Labor Gr | Subsequent Year | MEAN LABOR GRADE | | | PERCENTAGE SALARIED AND MANAGEMENT | | |
|---|---|---|---|---|---|---|---|---|
| | | | W | B | W-B | W | B | W-B |
| 1972 | 03 | 1973 | 4.5 | 4.3 | .2 | 3.1 | 0 | 3.1 |
| | | 1974 | 5.9 | 3.7 | 2.2 | 10.5 | 0 | 10.5 |
| | | 1975 | 5.1 | 4.3 | .8 | 6.7 | 0 | 6.7 |
| | | 1976 | 5.8 | 5.0 | .8 | 0 | 0 | - |
| | | 1977 | 5.8 | 5.0 | .8 | 0 | 0 | - |
| | | 1978 | 5.8 | 5.0 | .8 | 0 | 0 | - |
| | | 1979 | 5.6 | 5.0 | .6 | 0 | 0 | - |
| | | 1980 | 5.6 | 5.0 | .6 | - | - | - |
| 1972 | 04 | 1973 | 4.5 | 5.0 | - | 0 | 0 | 0 |
| | | 1974 | 5.9 | 5.4 | .5 | 0 | 0 | 0 |
| | | 1975 | 5.1 | 4.8 | .3 | 0 | 0 | 0 |
| | | 1976 | 5.8 | 5.5 | .3 | 0 | 0 | 0 |
| | | 1977 | 5.8 | 5.8 | .0 | 0 | 0 | 0 |
| | | 1978 | 5.8 | 5.9 | -.1 | 0 | 0 | 0 |
| | | 1979 | 5.6 | 5.8 | -.2 | 0 | 0 | 0 |
| | | 1980 | 5.6 | 5.9 | -.3 | - | - | - |
| 1972 | 05 | 1973 | 5.8 | 5.7 | .1 | 2.8 | 0 | 2.8 |
| | | 1974 | 6.3 | 5.9 | .4 | 8.7 | 0 | 8.7 |
| | | 1975 | 6.1 | 6.0 | .1 | 9.1 | 0 | 9.1 |
| | | 1976 | 7.0 | 6.0 | 1.0 | 0 | 0 | - |
| | | 1977 | 7.5 | 6.3 | 1.2 | 0 | 0 | - |
| | | 1978 | 7.3 | 6.3 | 1.0 | 0 | 0 | - |
| | | 1979 | 6.9 | 6.3 | .6 | 0 | 0 | - |
| | | 1980 | 6.9 | 6.3 | .6 | - | - | - |
| 1972 | 06 | 1973 | 6.3 | 6.1 | .2 | 6.8 | 0 | 6.8 |
| | | 1974 | 7.0 | 6.3 | .7 | 9.8 | 0 | 9.8 |
| | | 1975 | 6.8 | 5.6 | 1.2 | 7.5 | 0 | 7.5 |
| | | 1976 | 7.3 | 6.4 | .9 | 11.4 | 0 | 11.4 |
| | | 1977 | 7.5 | 6.6 | .9 | 14.7 | 0 | 14.7 |
| | | 1978 | 7.5 | 6.4 | 1.1 | 15.2 | 0 | 15.2 |
| | | 1979 | 7.8 | 6.4 | 1.4 | 12.5 | 0 | 12.5 |
| | | 1980 | 6.8 | 6.6 | .2 | - | - | - |

Amended Exhibit A-8

ALL 1973 HOURLY HIRES
INTO LABOR GRADES 03-06 WHO WERE
STILL EMPLOYED DURING SUBSEQUENT YEARS

| | | | MEAN LABOR GRADE | | | PERCENTAGE SALARIED AND MANAGEMENT | | |
|---|---|---|---|---|---|---|---|---|
| Hire Yr. | Initial Labor Gr | Subsequent Year | W | B | W-B | W | B | W-B |
| 1973 | 03 | 1974 | 5.7 | 5.3 | .4 | 0 | 0 | — |
| | | 1975 | 5.5 | 4.7 | .8 | 15.4 | 0 | 15.4 |
| | | 1976 | 6.6 | 5.2 | 1.4 | 25.0 | 0 | 25.0 |
| | | 1977 | 7.0 | 5.4 | 1.6 | 14.3 | 0 | 14.3 |
| | | 1978 | 6.7 | 5.0 | 1.7 | 0 | 0 | — |
| | | 1979 | 6.1 | 5.6 | .5 | 0 | 0 | — |
| | | 1980 | 6.7 | 5.6 | 1.1 | — | — | — |
| 1973 | 04 | 1974 | 5.6 | 5.3 | .3 | 0 | 0 | — |
| | | 1975 | 5.5 | 5.6 | -.1 | 0 | 0 | — |
| | | 1976 | 5.2 | 5.3 | -.1 | 5.6 | 0 | 5.6 |
| | | 1977 | 5.5 | 5.6 | -.1 | 5.6 | 0 | 5.6 |
| | | 1978 | 5.6 | 5.7 | -.1 | 6.3 | 0 | 6.3 |
| | | 1979 | 6.1 | 5.6 | .5 | 5.9 | 0 | 5.9 |
| | | 1980 | 5.5 | 5.7 | -.2 | — | — | — |
| 1973 | 05 | 1974 | 6.2 | 5.6 | .6 | 7.9 | 0 | 7.9 |
| | | 1975 | 5.8 | 5.4 | .4 | 10.3 | 0 | 10.3 |
| | | 1976 | 5.6 | 5.5 | .1 | 13.3 | 0 | 13.3 |
| | | 1977 | 6.2 | 6.0 | .2 | 13.3 | 0 | 13.3 |
| | | 1978 | 6.1 | 6.2 | -.1 | 14.3 | 0 | 14.3 |
| | | 1979 | 6.6 | 6.6 | .0 | 14.3 | 0 | 14.3 |
| | | 1980 | 6.0 | 6.6 | -.6 | — | — | — |
| 1973 | 06 | 1974 | 6.7 | 6.0 | .7 | 17.9 | 0 | 17.9 |
| | | 1975 | 5.8 | 6.1 | -.3 | 26.3 | 0 | 26.3 |
| | | 1976 | 5.8 | 5.8 | 0 | 18.2 | 0 | 18.2 |
| | | 1977 | 7.6 | 6.2 | 1.5 | 30.0 | 0 | 30.0 |
| | | 1978 | 7.6 | 6.1 | 1.5 | 22.2 | 0 | 22.2 |
| | | 1979 | 6.8 | 5.1 | 1.7 | 0 | 0 | — |
| | | 1980 | 6.8 | 5.1 | 1.7 | — | — | — |

Amended Exhibit A-9(a)

DISCHARGES

| Initial Labor Grades | Race | 1968-1980 Discharged | 1968-1980 Not Discharged | Total | chi-square | st'd dev. | probability | Statist. signif. |
|---|---|---|---|---|---|---|---|---|
| 01-02 | B | 36 | 262 | 298 | 7.668 | 2.769 | .0056 | * |
| | W | 10 | 196 | 206 | | | | |
| | Total | 46 | 458 | 504 | | | | |
| 03-04 | B | 41 | 271 | 312 | 31.588 | 5.620 | $<.0000001$ | * |
| | W | 29 | 732 | 761 | | | | |
| | Total | 70 | 1003 | 1073 | | | | |
| 05-06 | B | 38 | 242 | 280 | 31.831 | 5.642 | $<.0000001$ | * |
| | W | 61 | 1258 | 1319 | | | | |
| | Total | 99 | 1500 | 1599 | | | | |
| 05-08 | B | 42 | 256 | 298 | 38.898 | 6.237 | $<.000000001$ | * |
| | W | 67 | 1402 | 1469 | | | | |
| | Total | 109 | 1658 | 1767 | | | | |
| 01-08 | B | 119 | 789 | 908 | 80.775 | 8.987 | $<10^{-10}$ | * |
| | W | 106 | 2330 | 2436 | | | | |
| | Total | 225 | 3119 | 3344 | | | | |

Amended Exhibit A-9(b)

RELEASES

| Initial Labor Grades | Race | 1968-1980 Released | 1968-1980 Not Released | Total | chi-square | st'd dev. | probability | Statist. signif. |
|---|---|---|---|---|---|---|---|---|
| 01-02 | B | 31 | 298 | 329 | 5.234 | 2.888 | .022 | * |
| | W | 9 | 206 | 215 | | | | |
| | Total | 40 | 504 | 544 | | | | |
| 03-04 | B | 34 | 312 | 346 | 14.801 | 3.847 | .00012 | * |
| | W | 32 | 761 | 793 | | | | |
| | Total | 66 | 1073 | 1139 | | | | |
| 05-06 | B | 27 | 280 | 307 | 10.132 | 3.183 | .0015 | * |
| | W | 60 | 1319 | 1379 | | | | |
| | Total | 87 | 1599 | 1686 | | | | |
| 05-08 | B | 31 | 298 | 329 | 12.591 | 3.548 | .00039 | * |
| | W | 70 | 1469 | 1539 | | | | |
| | Total | 101 | 1769 | 1868 | | | | |
| 01-08 | B | 96 | 908 | 1004 | 35.522 | 5.960 | $<$.00000001 | * |
| | W | 111 | 2436 | 2547 | | | | |
| | Total | 207 | 3344 | 3551 | | | | |

EXHIBIT A-10

**GENERAL APTITUDE TEST BATTERY**
**SCORES FOR SUCCESSFUL APPLICANTS**

| | White | | | Black | | | t-test for difference | | statistical |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Mean | St'd Dev. | Number | Mean | St'd Dev. | t-test | prob. | significance |
| **Raw Scores 1964-1969** | | | | | | | | | |
| Test 5 | 1,046 | 101.97 | 16.489 | 281 | 89.58 | 15.406 | 11.34 | 0 | * |
| Test 6 | 1,060 | 102.08 | 13.987 | 284 | 95.15 | 13.001 | 7.53 | 0 | * |
| Test 8 | 978 | 96.77 | 17.442 | 261 | 89.31 | 18.832 | 6.03 | 0 | * |
| Test 9 | 954 | 107.18 | 17.835 | 252 | 104.87 | 17.281 | 1.85 | .065 | |
| **Converted Scores 1964-1978** | | | | | | | | | |
| Test 5 | 1,783 | 2.2098 | 0.837 | 620 | 2.0323 | 0.893 | 4.47 | 0 | * |
| Test 6 | 1,812 | 2.2456 | 0.815 | 630 | 2.1746 | 0.865 | 1.85 | .064 | |
| Test 8 | 1,626 | 2.1716 | 0.809 | 601 | 2.0050 | 0.873 | 4.22 | 0 | * |
| Test 9 | 1,497 | 2.0915 | 0.832 | 539 | 2.1614 | 0.835 | -1.67 | .095 | |

Exhibit A-11

1964-1978 CONVERTED SCORE
GENERAL APTITUDE TEST BATTERY SCORES
AND LABOR GRADES FOR SUCCESSFUL APPLICANTS
WHO TOOK ALL FOUR TESTS (5, 6, 8, 9)

| | | Race | Test 5 | Test 6 | Test 8 | Test 9 |
|---|---|---|---|---|---|---|
| correlation | Lab. Gr. | .441 | .196 | .161 | .115 | .154 |
| matrix | Race | | .137 | .031 | .028 | -.015 |
| | Test 5 | | | .638 | .389 | .346 |
| | Test 6 | | | | .393 | .329 |
| | Test 8 | | | | | .469 |

N=1,414

| | Variable | multiple r | r-square change | t-test | prob. | statistical signif. |
|---|---|---|---|---|---|---|
| multiple | Race | .441 | .194 | 18.794 | 0 | * |
| regression | Test 9 | .469 | .026 | 5.055 | 0 | * |
| to predict | Test 6 | .480 | .010 | 4.311 | 0 | * |
| Labor Gr. | Test 5 | - | - | 1.397 | .1627 | |
| | Test 8 | - | - | 0.097 | .9227 | |

N=1,414

Exhibit A-12

GENERAL APTITUDE TEST BATTERY
SCORES FOR SUCCESSFUL APPLICANTS
CONVERTED TO 10-POINT SCALE

| Test Number | Correlation with Race | t | Probability | Statistical Significance |
|---|---|---|---|---|
| 1 | 0.459 | 17.912 | $10^{-10}$ | * |
| 2 | 0.368 | 13.721 | $10^{-10}$ | * |
| 3 | 0.446 | 17.276 | $10^{-10}$ | * |
| 4 | 0.323 | 11.833 | $10^{-10}$ | * |
| 5 | 0.284 | 10.269 | $10^{-10}$ | * |
| 6 | 0.203 | 7.188 | $10^{-10}$ | * |
| 7 | 0.147 | 5.224 | .000001 | * |
| 8 | 0.167 | 5.872 | .0000001 | * |
| 9 | 0.068 | 2.363 | .02 | * |

Exhibit A-13

ALL HOURLY EMPLOYEES
## AVERAGE LABOR GRADES
(1968-1980)
OF LAST LABOR GRADES IN
EACH CALENDER YEAR

| Year | White | Average | Black | Average | W-B |
|------|-------|---------|-------|---------|-----|
| 1968 | ~~384~~ 613 | ~~6.2~~ 6.6 | ~~96~~ 147 | ~~3.9~~ 4.4 | ~~2.3~~ 2.2 |
| 69 | 630 | 6.5 | 196 | 4.8 | 1.7 |
| 70 | 623 | 6.7 | 258 | 5.2 | 1.5 |
| 71 | 594 | 6.8 | 318 | 5.2 | 1.6 |
| 72 | 801 | 6.6 | 443 | 5.0 | 1.6 |
| 73 | 907 | 6.6 | 493 | 5.2 | 1.4 |
| 74 | 911 | 7.0 | 525 | 5.6 | 1.4 |
| 75 | 777 | 7.0 | 470 | 5.3 | 1.7 |
| 76 | 643 | 7.6 | 389 | 5.9 | 1.7 |
| 77 | 691 | 7.5 | 395 | 6.1 | 1.4 |
| 78 | 661 | 7.7 | 385 | 6.1 | 1.6 |
| 79 | 662 | 7.8 | 385 | 6.1 | 1.7 |
| 80 | ~~540~~ 562 | 7.5 | ~~349~~ 366 | 6.1 | 1.4 |

Includes all employees during calendar year.

Exhibit A-14

ALL HOURLY EMPLOYEES

## AVERAGE LABOR GRADES
(1968-1980)
ON DECEMBER 31 OF EACH YEAR

| Year | White | Average | Black | Average | W-B |
|------|-------|---------|-------|---------|-----|
| 1968 | 401 | 7.0 | 110 | 4.6 | 2.4 |
| 69 | 497 | 7.0 | 181 | 5.2 | 1.8 |
| 70 | 493 | 7.0 | 230 | 5.4 | 1.6 |
| 71 | 503 | 6.9 | 255 | 5.3 | 1.6 |
| 72 | 661 | 6.5 | 408 | 5.1 | 1.4 |
| 73 | 682 | 6.8 | 436 | 5.3 | 1.5 |
| 74 | 698 | 6.9 | 467 | 5.7 | 1.2 |
| 75 | 507 | 7.4 | 295 | 5.8 | 1.6 |
| 76 | 562 | 7.4 | 377 | 5.9 | 1.5 |
| 77 | 606 | 7.4 | 393 | 6.0 | 1.4 |
| 78 | 621 | 7.3 | 395 | 6.0 | 1.3 |
| 79 | 552 | 7.5 | 367 | 6.1 | 1.4 |
| 80 | 560 | 7.5 | 370 | 6.1 | 1.4 |

Snapshot as of 12/~~13~~ 31 of each calendar year with terminations during year excluded.

Exhibit A-15

ALL HOURLY EMPLOYEES

LABOR GRADE WORKFORCE PROFILE
ON DECEMBER 31

| Year | Grade | W | B | Total | Chi Square | St'd Dev. | Prob. | Stat. Sig. |
|------|-------|-----|-----|-------|------------|----------|-------|------------|
| 1968 | 1-4 | 35 | 44 | 79 | 64.588 | 8.037 | 0 | * |
| | 5-17 | 366 | 66 | 432 | | | | |
| | Total | 401 | 110 | 511 | | | | |
| 1969 | 1-4 | 49 | 54 | 103 | 41.090 | 6.410 | $.2 \times 10^{-10}$ | * |
| | 5-17 | 448 | 127 | 575 | | | | |
| | Total | 497 | 181 | 678 | | | | |
| 1970 | 1-4 | 56 | 57 | 113 | 21.431 | 4.629 | $.4 \times 10^{-5}$ | * |
| | 5-17 | 437 | 173 | 610 | | | | |
| | Total | 493 | 230 | 723 | | | | |
| 1971 | 1-4 | 61 | 69 | 130 | 26.551 | 5.153 | $.3 \times 10^{-6}$ | * |
| | 5-17 | 442 | 186 | 628 | | | | |
| | Total | 503 | 255 | 758 | | | | |
| 1972 | 1-4 | 126 | 146 | 272 | 37.188 | 6.098 | $.1 \times 10^{-8}$ | * |
| | 5-17 | 535 | 262 | 797 | | | | |
| | Total | 661 | 408 | 1069 | | | | |
| 1973 | 1-4 | 97 | 139 | 236 | 49.798 | 7.057 | $.1 \times 10^{-11}$ | * |
| | 5-17 | 585 | 297 | 882 | | | | |
| | Total | 682 | 436 | 1118 | | | | |
| 1974 | 1-4 | 99 | 111 | 210 | 17.691 | 4.206 | $.3 \times 10^{-4}$ | * |
| | 5-17 | 599 | 356 | 955 | | | | |
| | Total | 698 | 467 | 1165 | | | | |
| 1975 | 1-4 | 47 | 65 | 112 | 25.287 | 5.029 | $.5 \times 10^{-6}$ | * |
| | 5-17 | 460 | 230 | 690 | | | | |
| | Total | 507 | 295 | 802 | | | | |
| 1976 | 1-4 | 57 | 65 | 122 | 10.059 | 3.172 | .0015 | * |
| | 5-17 | 505 | 312 | 817 | | | | |
| | Total | 562 | 377 | 939 | | | | |
| 1977 | 1-4 | 60 | 57 | 117 | 4.885 | 2.210 | .0271 | * |
| | 5-17 | 546 | 336 | 882 | | | | |
| | Total | 606 | 393 | 999 | | | | |
| 1978 | 1-4 | 63 | 63 | 126 | 7.489 | 2.736 | .0062 | * |
| | 5-17 | 558 | 332 | 890 | | | | |
| | Total | 621 | 395 | 1016 | | | | |
| 1979 | 1-4 | 49 | 62 | 111 | 13.341 | 3.653 | .0003 | * |
| | 5-17 | 503 | 305 | 808 | | | | |
| | Total | 552 | 367 | 919 | | | | |
| 1980 | 1-4 | 48 | 63 | 111 | 15.155 | 3.893 | .0001 | * |
| | 5-17 | 512 | 307 | 819 | | | | |
| | Total | 560 | 370 | 930 | | | | |

Restates Exhibit A-3, but excludes employees terminated during year before 12/31.

Exhibit A-16

STILL EMPLOYED ON DEC 31 OF SUBSEQUENT
YEARS
MEAN LABOR GRADE

| Hire | Grade | Year | Number White | Average | Number Black | Average | Difference |
|------|-------|------|--------------|---------|--------------|---------|------------|
| 1970 | 04 | 1971 | 17 | 5.6 | 12 | 5.1 | .5 |
| | | 72 | 13 | 6.3 | 11 | 5.7 | .6 |
| | | 73 | 13 | 6.5 | 9 | 5.9 | .6 |
| | | 74 | 11 | 6.4 | 9 | 6.0 | .4 |
| | | 75 | 12 | 6.3 | 8 | 5.9 | .4 |
| | | 76 | 12 | 6.3 | 9 | 6.1 | .2 |
| | | 77 | 11 | 6.5 | 9 | 6.2 | .3 |
| | | 78 | 11 | 6.5 | 9 | 6.2 | .3 |
| | | 79 | 11 | 6.5 | 8 | 6.3 | .2 |
| | | 80 | 11 | 6.5 | 9 | 6.3 | .2 |
| 1970 | 05 | 1971 | 6 | 5.8 | 6 | 4.5 | 1.3 |
| | | 72 | 6 | 6.5 | 5 | 6.2 | .3 |
| | | 73 | 5 | 8.0 | 4 | 6.3 | 1.7 |
| | | 74 | 7 | 7.4 | 4 | 6.3 | 1.1 |
| | | 75 | 5 | 9.2 | 3 | 6.0 | 3.2 |
| | | 76 | 5 | 9.6 | 3 | 6.0 | 3.6 |
| | | 77 | 5 | 10.4 | 3 | 6.0 | 4.4 |
| | | 78 | 5 | 10.4 | 3 | 6.0 | 4.4 |
| | | 79 | 5 | 10.4 | 3 | 6.0 | 4.4 |
| | | 80 | 5 | 10.4 | 3 | 6.0 | 4.4 |
| 1970 | 06 | 1971 | 20 | 6.4 | 20 | 6.1 | .3 |
| | | 72 | 14 | 7.1 | 18 | 6.4 | .7 |
| | | 73 | 13 | 7.2 | 16 | 6.6 | .6 |
| | | 74 | 13 | 8.2 | 14 | 7.0 | 1.2 |
| | | 75 | 12 | 6.6 | 13 | 6.5 | .1 |
| | | 76 | 13 | 7.0 | 14 | 6.7 | .3 |
| | | 77 | 12 | 7.2 | 14 | 6.8 | .4 |
| | | 78 | 12 | 6.9 | 14 | 6.9 | .0 |
| | | 79 | 14 | 7.8 | 14 | 6.8 | 1.0 |
| | | 80 | 14 | 7.8 | 14 | 6.8 | 1.0 |

Restates amended A-5. Excludes persons terminated prior to 12/31 of
each year.

Exhibit A-17

LABOR GRADES 04-06 WHO WERE STILL
EMPLOYED ON DEC. 31 OF SUBSEQUENT YEARS

MEAN LABOR GRADE

| Hire | Grade | Year | Number White | Average | Number Black | Average | Difference |
|------|-------|------|--------------|---------|--------------|---------|------------|
| 1971 | 04 | 1972 | 11 | 5.5 | 16 | 5.3 | .2 |
| | | 73 | 13 | 5.6 | 15 | 5.8 | -.2 |
| | | 74 | 13 | 6.4 | 14 | 6.1 | .3 |
| | | 75 | 10 | 6.3 | 12 | 5.6 | .7 |
| | | 76 | 13 | 6.2 | 12 | 5.8 | .4 |
| | | 77 | 13 | 6.4 | 12 | 6.1 | .3 |
| | | 78 | 13 | 6.2 | 12 | 6.2 | .0 |
| | | 79 | 11 | 6.1 | 12 | 6.2 | -.1 |
| | | 80 | 11 | 6.1 | 12 | 6.2 | -.1 |
| 1971 | 05 | 1972 | 5 | 6.8 | 7 | 6.1 | .7 |
| | | 73 | 4 | 7.3 | 5 | 6.2 | 1.1 |
| | | 74 | 4 | 7.5 | 5 | 6.2 | 1.3 |
| | | 75 | 4 | 6.0 | 5 | 5.8 | .2 |
| | | 76 | 4 | 6.8 | 5 | 6.2 | .6 |
| | | 77 | 4 | 7.3 | 5 | 6.4 | 1.3 |
| | | 78 | 4 | 7.3 | 5 | 6.6 | .7 |
| | | 79 | 4 | 8.3 | 5 | 6.6 | 1.7 |
| | | 80 | 4 | 8.3 | 5 | 6.6 | 1.7 |
| 1971 | 06 | 1972 | 15 | 7.2 | 9 | 5.9 | 1.3 |
| | | 73 | 12 | 7.5 | 9 | 5.9 | 1.6 |
| | | 74 | 12 | 7.6 | 9 | 6.8 | .8 |
| | | 75 | 14 | 6.9 | 9 | 6.1 | .8 |
| | | 76 | 11 | 6.9 | 9 | 6.3 | .6 |
| | | 77 | 11 | 7.6 | 9 | 6.7 | .9 |
| | | 78 | 10 | 7.9 | 9 | 6.7 | 1.2 |
| | | 79 | 11 | 8.3 | 9 | 6.7 | 1.6 |
| | | 80 | 11 | 8.3 | 9 | 6.7 | 1.6 |

Restates amended A-6. Excludes persons terminated prior to 12/31 of
each year.

Exhibit A-18

LABOR GRADES 03-06 WHO WERE STILL
EMPLOYED ON DEC.31 OF SUBSEQUENT YEARS

## MEAN LABOR GRADE

| Hire | Grade | Year | Number White | Average | Number Black | Average | Difference |
|------|-------|------|--------------|---------|--------------|---------|------------|
| 1972 | 04 | 1973 | 24 | 6.4 | 43 | 5.0 | 1.4 |
| | | 74 | 19 | 6.7 | 39 | 5.5 | 1.2 |
| | | 75 | 9 | 7.0 | 28 | 5.0 | 2.0 |
| | | 76 | 14 | 6.6 | 38 | 5.3 | 1.3 |
| | | 77 | 15 | 7.1 | 39 | 5.7 | 1.4 |
| | | 78 | 15 | 7.1 | 39 | 5.7 | 1.4 |
| | | 79 | 15 | 7.1 | 38 | 5.8 | 1.3 |
| | | 80 | 15 | 7.1 | 38 | 5.8 | 1.3 |
| 1972 | 05 | 1973 | 20 | 6.3 | 6 | 6.0 | .3 |
| | | 74 | 18 | 6.3 | 5 | 6.4 | -.1 |
| | | 75 | 16 | 6.4 | 4 | 6.0 | .4 |
| | | 76 | 17 | 7.0 | 4 | 6.0 | 1.0 |
| | | 77 | 15 | 7.2 | 4 | 6.3 | .9 |
| | | 78 | 15 | 7.3 | 4 | 6.3 | 1.0 |
| | | 79 | 16 | 6.9 | 3 | 6.3 | .6 |
| | | 80 | 16 | 6.9 | 3 | 6.3 | .6 |
| 1972 | 06 | 1973 | 47 | 6.6 | 24 | 6.1 | .5 |
| | | 74 | 36 | 7.2 | 24 | 6.3 | .9 |
| | | 75 | 29 | 6.9 | 15 | 5.4 | 1.5 |
| | | 76 | 31 | 7.1 | 17 | 6.2 | .9 |
| | | 77 | 32 | 7.7 | 16 | 6.2 | 1.5 |
| | | 78 | 32 | 7.6 | 17 | 6.1 | 1.5 |
| | | 79 | 31 | 7.9 | 15 | 6.2 | 1.7 |
| | | 80 | 32 | 7.8 | 15 | 6.2 | 1.6 |
| 1972 | 03 | 1973 | 16 | 5.3 | 3 | 3.7 | 1.6 |
| | | 74 | 15 | 5.7 | 3 | 2.7 | 2.0 |
| | | 75 | 12 | 4.9 | 2 | 3.5 | 1.4 |
| | | 76 | 11 | 5.6 | 3 | 5.0 | .6 |
| | | 77 | 12 | 5.7 | 3 | 5.0 | .7 |
| | | 78 | 12 | 5.7 | 2 | 4.5 | 1.2 |
| | | 79 | 13 | 5.5 | 3 | 5.0 | .5 |
| | | 80 | 13 | 5.5 | 3 | 5.0 | .5 |

Restates amended A-7. Excludes persons terminated prior to 12/31 of
each year.

Exhibit A-19

LABOR GRADES 03-06 WHO WERE STILL
EMPLOYED ON DEC. 31 OF SUBSEQUENT YEARS

## MEAN LABOR GRADE

| Hire | Grade | Year | Number White | Average | Number Black | Average | Difference |
|------|-------|------|--------------|---------|--------------|---------|------------|
| 1973 | 03 | 1974 | 12 | 5.8 | 7 | 5.6 | .2 |
| | | 75 | 4 | 5.0 | 2 | 4.5 | .5 |
| | | 76 | 7 | 6.6 | 5 | 4.2 | 1.4 |
| | | 77 | 8 | 6.8 | 5 | 5.4 | 1.4 |
| | | 78 | 8 | 6.8 | 5 | 5.0 | 1.8 |
| | | 79 | 7 | 6.7 | 5 | 5.6 | 1.1 |
| | | 80 | 7 | 6.7 | 5 | 5.6 | 1.1 |
| 1973 | 04 | 1974 | 33 | 5.8 | 24 | 5.5 | .3 |
| | | 75 | 9 | 5.0 | 5 | 7.4 | -2.4 |
| | | 76 | 17 | 5.5 | 14 | 5.5 | .0 |
| | | 77 | 17 | 5.6 | 16 | 5.6 | .0 |
| | | 78 | 17 | 5.6 | 16 | 5.8 | -.2 |
| | | 79 | 17 | 6.3 | 13 | 5.8 | .5 |
| | | 80 | 17 | 6.2 | 13 | 5.8 | .4 |
| 1973 | 05 | 1974 | 23 | 6.2 | 7 | 6.0 | .2 |
| | | 75 | 5 | 5.4 | 2 | 5.5 | -.1 |
| | | 76 | 11 | 5.5 | 5 | 5.6 | -.1 |
| | | 77 | 12 | 6.5 | 5 | 6.0 | .5 |
| | | 78 | 12 | 6.5 | 5 | 6.2 | .3 |
| | | 79 | 12 | 7.2 | 5 | 6.6 | .6 |
| | | 80 | 13 | 7.0 | 5 | 6.6 | .4 |
| 1973 | 06 | 1974 | 17 | 6.9 | 14 | 6.0 | .9 |
| | | 75 | 6 | 5.0 | 3 | 6.0 | -1.0 |
| | | 76 | 11 | 6.2 | 10 | 5.8 | .4 |
| | | 77 | 11 | 7.2 | 9 | 6.2 | 1.0 |
| | | 78 | 11 | 7.2 | 9 | 6.1 | .9 |
| | | 79 | 10 | 6.6 | 9 | 5.1 | 1.5 |
| | | 80 | 10 | 6.6 | 9 | 5.1 | 1.5 |

Restates amended A-8. Excludes persons terminated prior to 12/31 of each year.